DELAWARE, L. & W. R. CO. v. VAN SANTWOOD et al., Public Service Commission of Second District of New York.

(District Court, N. D. New York. July 14, 1914.)

1. RAILROADS (§ 218*)—SERVICE—PUBLIC SERVICE COMMISSION—ORDERS.

Where a railroad company discontinued two trains a day each way, and was ordered by the public service commission to restore them, and it appeared that the people residing in the terminal cities were amply served without them, the question of the right of the commission to order the trains restored depended on whether the convenience and necessities of the residents of certain small intervening towns demanded the restoration and operation of the trains in question.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 715; Dec. Dig. § 218.*]

2. RAILROADS (§ 218*)—SERVICE—NECESSITY OF ADDITIONAL SERVICE.

Where a railroad operated a line between two cities, and sufficient steam trains were run to accommodate the necessities of the people of those cities and an intervening city, and two steam trains a day each way were run which reasonably served the convenience and supplied the reasonable necessities of four small intervening points, the residents of which also had the convenience of a through interurban trolley line, complainant would be considered as having performed its whole duty to the public, and could not be compelled by the public service commission to operate two additional trains over the road each way per day at a net loss of over $3,000 per annum.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 715; Dec. Dig. § 218.*]

In Equity. Suit by the Delaware, Lackawanna & Western Railroad Company to restrain Seymour Van Santwood and others, constituting the Public Service Commission of the Second District of New York, from enforcing an order requiring complainant to restore, run, and operate two trains each way, in addition to the service existing at the date of the order between Oswego and Syracuse. Decree for complainant.

F. W. Thompson, of New York City, for complainant.
L. P. Hale, of Albany, N. Y., for defendants.

RAY, District Judge. The complainant is a corporation of the state of Pennsylvania and engaged principally in interstate commerce and transportation of both freight and passengers. It does considerable intrastate business.

The city of Oswego, with a population, in 1910, of 23,368, is situated on Lake Ontario, at the mouth of the Oswego river, and is distant

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

from the city of Syracuse some 35 miles, which has a population of some 180,000 and is situated on the main lines of the New York Central & Hudson River Railroad Company. In 1865, the city of Oswego had a population of 19,288. The intervening towns are Fulton, 24 miles from Syracuse and 11 miles from Oswego, with a population of 10,480; Baldwinsville, 12 miles from Syracuse, with a population of 3,099; South Granby, 19 miles from Syracuse, with a population of 84; Lamson, 16 miles from Syracuse, with a population of 750. In addition, there is Little Utica off the line and west of Lamson 3 miles, with a population of 100, and Lysander with a population of 305 situated five miles west of Lamson. There is considerable manufacturing at Oswego, Fulton, and Baldwinsville, substantially none at the other points, except Syracuse, and the surrounding country is made up of farms of ordinary fertility. Each of the places named has a post office.

The two trains in question had been run by the complainant some years prior to their discontinuance. At the time of such discontinuance and also at the time of the making of the order complained of, there was the following service by steam operated roads between Oswego and Syracuse, viz.: By the Delaware, Lackawanna & Western Railroad running through Fulton, Baldwinsville, Lamson, and South Granby, four trains each way daily; by the New York Central & Hudson River Railroad by way of Fulton and Phoenix, four trains each way daily; by New York, Ontario & Western, through Fulton to Oneida, there connecting with the New York Central & Hudson River, two trains each way daily; and by the Empire Railways Company, a trolley line, running cars through Fulton and Baldwinsville at least every half hour for the day and part of the night. It is evident that, considering the population to be served, eight steam operated trains each way with a trolley car every half hour in addition was more than what was necessary for Syracuse, Baldwinsville, and Fulton. Lamson and South Granby had the four D. and L. steam trains and were within three miles from the trolley line. Lysander and Little Utica are off the line entirely from 3 to 6 miles. By discontinuing the two trains in question Lamson and South Granby and passengers coming from Lysander and Little Utica were deprived of the two steam trains each way, but could be served by the trolley line in cases of necessity by some travel by ordinary road.

This line of road from Syracuse to Oswego while leased and operated by the Delaware, Lackawanna & Western is a separate corporation. It is seen that Oswego and Fulton are each a competitive point for the four roads named, and South Granby, Lamson, and Little Utica and Lysander for the Delaware, Lackawanna & Western and the trolley line.

In 1884, the gross revenues of the Delaware, Lackawanna & Western for operating these four trains each way between Syracuse and Oswego were $103,660.37. The trolley line was not then in operation. This revenue has steadily decreased until in 1912 it was for the same service only $36,111.36, a decrease of $67,549.01, for 1912, comparing 1884 with 1912. This was not due to any change of schedule. In

1890, the complainant carried 340,648 passengers on this line between Syracuse and Oswego, an average haul of 12 miles and of 20 cents per mile revenue per passenger, while in 1912 the average haul per passenger was 11 miles and 21 cents revenue. For some years the complainant has been operating and running these four trains at a large loss. It cannot be denied that the running and operation of these two trains in question (ordered restored) and which are discontinued is wholly unnecessary for all the points and the principal points mentioned. For Lamson, South Granby, Little Utica and Lysander, their running would be convenient for the people residing at those points and those residing elsewhere and desiring to visit those points.

The main line of the Delaware, Lackawanna & Western runs from New York to Buffalo with this branch to Syracuse and Oswego. This branch is made up of two roads owned by other companies but leased by the Delaware, Lackawanna & Western. It is evident that if the line from Oswego to Syracuse, the Oswego & Syracuse Railroad, was being run by the company owning it, itself, it could not maintain the service demanded by the order of the commission. A prolonged effort so to do would bankrupt the owner. However, the convenience, etc., of the public who desire to use the line to Syracuse and Binghamton and to Oswego and the main line and other connecting lines is to be considered.

[1] The true inquiry is whether or not the convenience and necessities of the people at South Granby, Lamson, Little Utica, and Lysander demand the restoration, running, and operation of the two trains in question (those discontinued and ordered restored). South Granby and Lamson are on the line, and the combined population is, in round numbers, 850. Lysander and Little Utica have a population combined of 400, and to serve the necessities and convenience of these 1,250 people, residing in an agricultural community, should the complainant, the Delaware, Lackawanna & Western Railroad Company, be compelled to operate four trains per day each way between Oswego and Syracuse at a large pecuniary loss to the company? Are not two trains each way on complainant's road sufficient for the convenience and necessities of the public? It is not contended by the complainant that taken as a whole the road is run and operated (exclusive of freight trains) at a loss, or that the branch, made up of two leased roads, from Oswego to Binghamton, fails to pay expenses, etc., when these trains in question are operated. In Minneapolis & St. Louis R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151, in reference to rates fixed by the commission, it was held:

"The presumption is that the rates fixed by the commission are reasonable, and the burden of proof is upon the railroad company to show the contrary. A tariff fixed by the commission for coal in car load lots is not proved to be unreasonable, by showing that if such tariff were applied to all freight the road would not pay its operating expenses, since it might well be that the existing rates upon other merchandise, which were not disturbed by the commission, might be sufficient to earn a large profit to the company, though it might earn little or nothing upon coal in car load lots."

St. Louis & San Francisco R. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, is another rate case, and it is recognized that,

when a state regulation establishes rates so unreasonable as to practically destroy the value of the property of companies engaged in the carrying business, such legislation is in conflict with the Constitution of the United States as depriving the company of its property without due process of law, etc.; but, when railroads in one state become consolidated with others in another state, it was held that the proper test of the reasonableness of the rates is as to their effect upon the consolidated line as a whole.

[2] If in the case of the Delaware, Lackawanna & Western Railroad, extending as it does through New Jersey, the eastern half of Pennsylvania, and the western half and central portion of the state of New York, railroad commissioners created by the several states named may prescribe that sufficient trains from point to point, as from Water Gap to Scranton, Scranton to Binghamton, Binghamton to Norwich, Norwich to Utica, Binghamton to Elmira, and Syracuse to Oswego, and so on covering the entire road, must be run to accommodate the necessities and convenience of all the people in each of the small intervening towns, even though operated at a loss, the profits of the road and all its accumulations would soon be eaten up, and in a few years this road, so operated, would become worthless.    If numerous nonpaying trains may be compelled in order to serve the convenience of a very few residing in small towns situated between two larger places on the line of the road, it may be done at all points on the line, and the profits, if any, of the paying trains, including freight, will be eaten up; and, if there is to be a curtailment of service, where shall it be, and on what principal based?    What is reasonable and what is reasonably necessary is not to be determined by the occasional wants and wishes and convenience of a very few people living at points along the line.    It seems to me that when steam trains enough are run between the city of Oswego and the city of Syracuse to accommodate and serve the necessities of the people of those cities and the intervening city of Fulton, and two steam trains per day each way are run which reasonably serve the convenience and supply the reasonable necessities of the four small intervening points, and these people also have the convenience of the trolley line as described, the complainant has performed its whole duty to the public, and that to compel the running of the two additional trains between these points at a net loss of over $3,000 per annum is unjust and unreasonable and in violation of the constitutional rights of the complainant.

In 33 Cyc. 639, 640, we find the following:

"Train Service and Accommodations.—A railroad company authorized to condemn land and act as a common carrier must provide such train service and accommodations as will meet the necessities of the general public, and not merely serve private interests; but the extent of its duty in this regard varies as the exigencies of the traffic and its remunerative character demand and justify, and the manner in which it shall conduct its business, including the number and frequency of trains, rests largely in the discretion of the company.    While this discretion must be exercised in good faith and with a due regard to the interests of the public, it seems that in the absence of express statutory authority the courts have no power to interfere with it or to require more trains or additional accommodations so long as the railroad company does not suspend or cease its duties as a common carrier, and certainly

such an order is unwarranted where the road as operated is unable to pay expenses, or where it is not shown that the facilities furnished are not reasonably adequate and the increase demanded would impose an undue hardship upon the company. A railroad company is bound on common-law principles to stop a sufficient number of its trains at stations to meet the demands of public convenience and business necessity; but it is a reasonable regulation on the part of the railroad company that certain trains shall not stop at all stations provided there are enough to serve the purpose of local travel, except as to places where it is expressly required by statute that all trains shall stop. Separate trains for freight and passengers should be run if there is a demand for each class of traffic and the business of the road is sufficiently large and profitable to warrant it, but otherwise this will not be required and mixed trains may be operated. A board of railroad commissioners has no authority to interpret and enforce a contract between a railroad company and private individuals as to the maintenance of a station, but where in the consideration of the granting of a right of way the railroad company agrees with a landowner to build a station upon his land and stop all regular trains at it, he may maintain an action for the specific performance of the contract."

See, also, what is said in Atlantic Coast Line R. Co. v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, 11 Ann. Cas. 398.

The injunction pendente lite is granted.