IN RE APPLICATION OF CHICAGO, BURLINGTON & QUINCY
RAILROAD COMPANY. CHICAGO, BURLINGTON & QUINCY
RAILROAD COMPANY, APPELLANT, V. MUNICIPALITIES OF
HOLDREGE, NEBRASKA, ET AL., APPELLEES.
41 N. W. 2d 157

Filed February 9, 1950. No. 32706.

*Aten & Chadderdon, J. W. Weingarten,* and *W. P. Loomis,* for appellant.

*Anderson, Storms & Anderson, Fitzgerald & Smith,* and *Perry & Perry,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The Chicago, Burlington & Quincy Railroad Company, a common carrier of passengers and freight in Nebraska and other states, applied to the Nebraska State Railway Commission, hereinafter referred to as the commission, for permission to discontinue motor passenger trains numbered 151 and 152 operated daily except Sunday on the branch line of the railroad betweeen Holdrege, Nebraska, and the Nebraska-Colorado state line. From Holdrege west to the state line dividing the states of Nebraska and Colorado are the following towns and stations: Loomis, Bertrand, Smithfield, Elwood, Eustis, Kingston, Farnam, Ingham, Moorefield, Curtis, Maywood, Wellfleet, Somerset, Dickens, Wallace, Grainton, Elsie, Madrid, Grant, Brandon, and Venango, Nebraska. The combined population of the towns served by this branch line in Nebraska is estimated at 12,000, and the area served is estimated at 12,000 square miles. The

basic industries are agriculture, livestock production, dairying, and poultry raising. The municipalities named and the Omaha Cold Storage Company appeared before the commission, represented by counsel, and filed objections to the application. On the issues presented by the pleadings, and after an extended hearing, the commission made findings of fact against the applicant and in favor of the protestants, and denied the application. From this order the applicant appealed to this court and submitted for review the sufficiency of the evidence to sustain the order.

The appellant railroad company contends (1) that the findings, conclusions, and order of the commission are contrary to the evidence, not sustained by any substantial evidence, and are also contrary to law; and (2) the findings, conclusions, and order of the commission are unreasonable, unjust, and arbitrary.

The commission acquired jurisdiction and had power under the Constitution and the statutes to consider and determine the issues. Art. IV, § 20, Constitution of Nebraska; § 75-201, R. S. 1943.

"On an appeal to the Supreme Court from an order of the Nebraska State Railway Commission administrative or legislative in nature, the only questions to be determined are whether the Nebraska State Railway Commission acted within the scope of its authority and if the order complained of is reasonable and not arbitrarily made." In re Application of Neylon, 151 Neb. 587, 38 N. W. 2d 552. See, also, Furstenberg v. Omaha & C. B. St. Ry. Co., 132 Neb. 562, 272 N. W. 756.

The distance from Holdrege, Nebraska, to Sterling, Colorado, is 230 miles, of which 162 miles is between Holdrege and Venango, Nebraska. The distance between Venango, Nebraska, and Sterling, Colorado, is 68 miles.

Main line connections to other points are made at Holdrege, Nebraska, and Sterling, Colorado.

Trains 151 and 152 are primarily passenger trains and

run daily except Sunday in each direction between Holdrege, Nebraska, and Sterling, Colorado. .The equipment of the trains consists of a 400-horsepower gas-electric motor car and a trailer passenger coach. They carry passengers, mail, baggage, cream, and express. Each train requires a crew of one motorman, one conductor, and one brakeman-baggageman for their operation. In addition thereto, the United States Post Office Department operates on said trains a railway post office in charge of a railway postal clerk. These trains, for a long time, have been operating on a schedule as follows: Train 151 leaves Holdrege, Nebraska, at 5:40 a. m., mountain time, passing through and serving the communities as above set out, and arrives at Venango, Nebraska, at 11:45 a. m., and at Sterling, Colorado, at 2:10 p. m., mountain time. Train 152 leaves Sterling, Colorado, at 6 a. m., mountain time, arrives at Venango, Nebraska, at 8:14 a. m., and at Holdrege at 1:40 p. m., mountain time. The appellant also operates on this branch line mixed trains 153 and 154 tri-weekly, now scheduled westward to leave Holdrege on Sunday, Wednesday, and Friday, and to arrive from the west at Holdrege on the same days.

The jurisdiction of the commission to regulate the transportation service rendered by trains 151 and 152 is limited to the transportation of persons or property wholly between points in Nebraska, that is, intrastate commerce. See, Chicago, B. & Q. R. R. Co. v. Illinois Commerce Commission, 82 F. Supp. 368; 15 C. J. S., Commerce, § 55, p. 372.

The record discloses that trains 151 and 152 have been operated over this branch line for a great many years, and before the event of common usage of the automobile provided the only rapid and convenient means of travel between places on, and to and from points on, this branch line. In 1923 and 1924, train 151 averaged 18 and 14 passengers per train mile, and train 152 averaged 16 and 13.2 passengers per train mile. Subsequently there

was a material decline in the number of passengers on these trains, and then an increase was evident during the war years of 1942 to 1945, due to the rationing of gasoline and tires, and the induction into military service of draftees. These trains had been operated by steam power, and in 1940, due to decline in passenger service, the motor car was put on, and also a combination passenger and baggage car instead of a full passenger coach, to reduce expenses to conform to revenues. Since the war years the passenger traffic has declined to almost abandonment of such services. During the 12 months ending with August 31, 1948, train 151 carried an average of 2.6 passengers and train 152 carried an average of 2.3 passengers per train mile between Holdrege and the Nebraska-Colorado state line. In September 1948, train 151 averaged 2.0 passengers and train 152 averaged 1.4 passengers per train mile in Nebraska. From October 1948, to March 1949, inclusive, excluding January when operation of the trains was suspended on account of heavy snow, train 151 averaged 1.8 passengers and train 152 averaged 1.7 passengers per train mile in Nebraska. In considering the average number of passengers per train mile there is taken into account the number of passengers carried and the distance each travels.

The passenger revenue on train 151 for the 12 months ending August 31, 1948, was 6.24 cents and train 152 was 5.52 cents per train mile. During the 12 months ending with August 31, 1948, train 151 averaged 9.2 passengers and train 152 averaged 8.4 passengers per trip between Holdrege and the Nebraska-Colorado state line. The wages paid employees to operate these trains amount to 26.33 cents per train mile, which is in excess of the passenger revenue, without considering other operative expenses.

There is not much contradiction in the testimony that trains 151 and 152 are operated at a substantial loss. A net loss of $50,856 is shown for the 12 months ending August 1948, and for the same period, between Holdrege

and the Nebraska-Colorado state line the revenues were $35,293, out-of-pocket expenses $70,161, net loss $34,868. For the six months, September 1948 to March 1949, revenues $15,584, out-of-pocket expense $39,973, net loss $24,389.

The appellees contend that the appellant's railroad system as a whole operates at a profit, as does the branch line in question. There are exhibits disclosing that this branch line earned a net revenue of $167,914, at least, for the year ending August 31, 1948. The appellant concedes the branch line operated at a profit.

This court, in In re Application of Chicago, B. & Q. R. R. Co., 138 Neb. 767, 295 N. W. 389, in a case to discontinue trains 97 and 98 on a branch line between Beatrice and Holdrege, said: "A ruling based on the abandonment of an unprofitable branch line of railroad, while its entire mileage is operated at a profit, is not necessary to a decision on this appeal and decisions of administrative boards and opinions of courts on such a problem are not controlling herein."

When a carrier's operations as a whole are reasonably profitable it has been held in various cases that it should not be required to continue the operation of passenger trains that show such disproportionate losses as to indicate that they are not substantially used or needed by the public. See, Palmer v. Massachusetts, 308 U. S. 79, 60 S. Ct. 34, 84 L. Ed. 93; Delaware, L. & W. R. R. v. Van Santwood, 216 F. 252; Delaware, L. & W. R. R. Co. v. Van Santvoord, 232 F. 978; Mississippi Railroad Commission v. Mobile & O. R. R. Co., 244 U. S. 388, 37 S. Ct. 602, 61 L. Ed. 1216; Blease v. Charleston & W. C. Ry. Co., 146 S. C. 496, 144 S. E. 233; Northern Pac. Ry. Co. v. Board of Railroad Commissioners, 46 F. Supp. 340; Brooks-Scanlon Co. v. Railroad Commission, 251 U. S. 396, 40 S. Ct. 183, 64 L. Ed. 323; Northern Pac. R. R. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F 1148, Ann. Cas. 1916A 1.

All of the witnesses save one who testified for the

appellees at the hearing before the commission attended the hearing by driving thereto in their automobiles or riding with others using their automobiles. The registered number of automobiles in the communities served by the two trains in question is exceedingly high. There is one automobile for approximately every 3.5 persons in this area in Nebraska.

Some contention is made that these trains serve the faculty and students, and others connected with, attending, or transacting business with the State Agricultural School at Curtis, Nebraska. From the record, such use of these trains is exceedingly slight.

State Highway No. 23 parallels the entire length of the appellant's railroad from Holdrege to Elwood; State Highway No. 23N from Elwood to Curtis; and State Highway No. 23 from Curtis to the Nebraska-Colorado state line. These are gravel-surfaced highways constructed and maintained by the Nebraska Department of Roads and Irrigation. Numerous state and federal highways extend north and south at different points from towns on the line to places on the Union Pacific main line to the north, and the appellant's main line to the south, and connect with east and west highways paralleling those lines. Due to the number of hills and curves, the construction of the state highways generally, and the lack of gravel on some parts thereof, the highways do become blocked or impassable at times on account of bad weather. Although these state highways may not be classified as among the best all-weather highways in the state, the evidence shows that they are used extensively by automobiles, private-carrier trucks, common-carrier trucks, and by a bus line.

It should not be assumed or found, in the absence of evidence, of which there is none, that state officers will fail to perform their duty to keep state highways in a reasonably safe condition for mail and express routes and for other public purposes. See In re Application of Chicago, B. & Q. R. R. Co., *supra.*

"The passenger transportation revolution wrought by the private automobile and certificated bus, in connection with a vast system of improved highways, has not only resulted in transferring the radically larger proportion of the passenger transportation needs and services from the local railroad passenger train to the highway, but the convenience afforded by the private automobile in connection with said highways has so outmoded the local railroad passenger train * * * as to cause said local train service to become an obsolete form of transportation." Chicago, B. & Q. R. R. Co. v. Illinois Commerce Commission, *supra*. See, also, In re Application of Chicago, B. & Q. R. R. Co., *supra;* Texas & New Orleans R. R. Co. v. Railroad Commission, (Tex. Civ. App.) 220 S. W. 2d 273.

The appellees contend that public convenience and necessity require the continuance of these trains due to the business investment and the volume thereof conducted along this branch line; that there is an investment of over ten million dollars in business, and an annual gross business of fifty million dollars along this branch line to the Nebraska-Colorado state line.

The record shows that these business houses are served adequately as to most of their needs by private carriers or trucks operated by wholesale houses, jobbers, or manufacturers located in cities like North Platte, Kearney, Grand Island, Hastings, Holdrege, McCook, and other cities. Included in such service is delivery of fruits, drugs, petroleum products, automobile accessories, tires, drug sundries, dry goods, groceries, and cream. Every community along this branch line is reached and served by one or more common carriers, by trucks, and innumerable private carriers. The commodities so delivered are such as are carried by the incidental service to the passenger service on trains 151 and 152.

With reference to the express and cream traffic on trains 151 and 152, appellant shows that the express amounted to 3,000 pounds daily. An exhibit shows an

average of 3,096 cans of cream a month shipped on these two trains. The months of October, November, and December are not shown on this exhibit. The amount of cream shipped by rail during these three months on the average and considered together with the average amount of cream shipped by rail as shown by the exhibit, would not materially increase the revenue of appellant to the extent that continuance of these trains should be had to transport this product in the light of all other transportation facilities that are engaged in handling cream.

The appellees contend· that the public served by this branch line will suffer expense and inconvenience if trains 151 and 152 are eliminated, especially with reference to the transportation of such items as heretofore mentioned and others as follows: Emergency repairs for farm implements during the harvest season; the transportation of flowers, currency to banks, yeast to a baker, and films to theatres; distribution of a newspaper printed at Holdrege; and shipments of fresh meat and chicks, the latter necessitating either a heated train car or heated vehicle by common carrier or by mail.

An analysis of the record discloses that while there may be some inconvenience in the transportation of certain of these items, such items can be readily transported by other transportation facilities, such as by mail, by express, by private carrier, private automobile, bus, or common-carrier trucks, also by appellant's tri-weekly mixed trains. The evidence further shows that the appellant will equip mixed trains 153 and 154 with a car similar to that on trains 151 and 152 for passengers and the handling of cream and express. These trains will be operated on a fixed schedule with assigned crews, not irregularly as extras as they have been. The proposed schedule is to operate west from Holdrege on Mondays, Wednesdays, and Fridays, and east to Holdrege on Tuesdays, Thursdays, and Saturdays, making daily service in one direction or the other on the line, depend-

ing upon what the public wants and will best fit the needs of the patrons, and adhering to schedule as closely as possible.

"Where some inconvenience would result to small number of public by discontinuance of service on branch line of railroad, but other services existent and prospective could handle all the business handled by the railroad with comparatively little extra trouble and additional expense to the public, evidence sustained implied finding that loss in revenue by continuance of service on branch line overbalanced inconvenience to the public from discontinuance thereof, and that it was unreasonable for Corporation Commission to deny an application of railroad to discontinue branch line service." Corporation Commission v. Southern Pac. Co., 55 Ariz. 173, 99 P. 2d 702.

The appellees contend that public convenience and necessity require the continuance of trains 151 and 152 for the distribution of mail along this branch line, and that any proposed substitute therefor will not meet the requirements of such distribution.

The record shows that the United States Post Office Department will cancel the mail contract as of date of January 1, 1950, with the appellant unless the appellant meets certain requirements of the department. To meet the requirements of the department would necessitate additional operating expense or the procurement of diesel equipment by the appellant at a great expense. The result would be to constitute a loss in carrying the mail for the department over and above the amount it would receive for the mail contract.

The appellant is not a common carrier of the United States mail. The collection and delivery of all such mail is the function of the United States government exclusively. In an application to discontinue local railroad passenger trains such as 151 and 152, any alleged inconvenience with respect to the collection, transportation, or delivery of United States mail is irrelevant. It should

not be assumed that the Postmaster General of the United States will fail to perform his duty to furnish adequate mail services for the people residing along this branch line of railroad. See, In re Application of Chicago, B. & Q. R. R. Co., *supra;* Chicago, B. & Q. R. R. Co. v. Illinois Commerce Commission, *supra.*

The appellees contend that the bus service which has been operating daily except Sunday over State Highways Nos. 23 and 23N, serving the towns along this branch line with the exception of those west of Curtis, is inadequate from the basis of passenger carriage and by equipment to handle express and baggage, which necessarily requires the services of trains 151 and 152. This bus carries 12 to 14 passengers, newspapers, small baggage, express up to 10 pounds, clothes for dry cleaning, and freight. The schedule of the bus as shown by the record is adequate to attract passengers and carry the commodities mentioned. This carrier has made application to the proper authority for the privilege of operating two busses daily in each direction between Holdrege and Curtis, and one bus daily between Curtis and the Nebraska-Colorado state line. There is bus service daily between Benkelman and Ogallala which serves Grant, and bus service daily between McCook and North Platte which serves Maywood and Curtis. This bus service rendered with other transportation facilities and the proposal of this appellant to carry passengers, freight, baggage, cream, and other commodities on schedule by two mixed trains, 153 and 154, should be adequate.

The railroad is in competition with bus and truck lines as well as private automobiles which travel over highways built, not by private capital, as is the case with rail carriers, but by public expenditures. See Atlantic Coast Line R. R. Co. v. Public Service Commission, 77 F. Supp. 675.

If, in the future, there should be any unreasonable departure from the schedules of trains 153 and 154, the regulatory power of the Nebraska State Railway Com-

mission will be available for public remedy. See In re Application of Chicago, B. & Q. R. R. Co., *supra.*

The appellees contend that the appellant has done everything it can to discourage, and nothing whatsoever to encourage and increase use of these trains, and should not now be heard to complain because of alleged conditions of its own making. It is suggested that better schedules might be arranged and the train improved as to equipment to attract passenger traffic. The passenger transportation facilities on trains 151 and 152 are obsolete and outmoded. There is no evidence to show that under any circumstances would the passenger traffic improve on the two trains in question. There has been no apparent effort made by the public in the communities served by these trains to utilize such passenger service. Contra, the evidence shows the residents of the localities traversed by these trains do not care for the service by their failure to give them patronage. See Northern Pac. Ry. Co. v. Board of Railroad Commissioners, *supra.*

The court cannot close its eyes to conditions as they exist and which are well known to everyone. A railroad company has but limited powers of management. It has no final power to fix rates, therefore little control over its revenue. Its control over expenses, particularly wages, is strictly limited. In managerial functions it is restricted by rules arising from contracts with well-integrated and nation-wide labor organizations. It is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed or used by the public to any substantial extent. See, Atlantic Coast Line R. R. Co. v. Public Service Commission, *supra;* Blease v. Charleston & W. C. Ry. Co., *supra.*

In determining whether public convenience or necessity requires the continuance of trains 151 and 152, the rules announced in older legal precedents established prior to the transportation revolution wrought by public highways, private automobiles, certificated bus and

common-carrier trucks and private trucks carrying commodities to customers, are no longer applicable, for the reason that the same have not only destroyed the railroads' former monopoly of the passenger transportation business, but it has also made the local railroad passenger train an obsolete form of transportation. See Chicago, B. & Q. R. R. Co. v. Illinois Commerce Commission, *supra*.

From an examination and consideration of the record, the operative expenses of trains 151 and 152 substantially exceed the revenue. Other transportation facilities are adequate for passenger service and the carriage of all other commodities as heretofore set forth in this opinion. We conclude that the order of the Nebraska State Railway Commission in denying the appellant discontinuance of trains 151 and 152 is arbitrary and unreasonable and not supported by substantial evidence. The order of the commission is vacated and the issues raised by the application are remanded to the commission for further consideration in accordance with the principles announced herein.

REVERSED AND REMANDED.