CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellant, vs. PUBLIC SERVICE COMMISSION, Respondent.

*September 7—October 5, 1954.*

For the appellant there was a brief by *Bender, Trump, McIntyre, Trimborn & Godfrey,* attorneys, and *Rodger S. Trump* of counsel, all of Milwaukee, and oral argument by *Rodger S. Trump.*

For the respondent there was a brief by the *Attorney General* and *William E. Torkelson,* chief counsel for the Public Service Commission, and oral argument by *Mr. Torkelson.*

A brief was also filed by *Wurster & Curtis* of Merrill for the cities of Merrill and Tomahawk, and the town of Minocqua.

STEINLE, J. The appellant Railroad Company seeks a reversal of the commission's order for the reasons: (1) That it is unsupported by substantial evidence in view of the entire record; (2) because the findings, inferences, and conclusions of the commission are contrary to the railroad's constitutional rights and privileges; and (3) further because they are arbitrary and capricious.

Sec. 227.20 (1), (2), Stats., provides:

"(1) The review shall be conducted by the court without a jury and shall be confined to the record, . . . The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions, or decisions being:

"(a) Contrary to constitutional rights or privileges; or

"(b) and (c) . . .

"(d) Unsupported by substantial evidence in view of the entire record as submitted; or

"(e) Arbitrary or capricious.

"(2) Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it. . . ."

Appellant contends that the patronage of the passenger trains in question has decreased and the loss of operations has increased to an extent where it should no longer be compelled to furnish service in the area, except as proposed by it.

The respondent maintains that the Railroad Company has a duty to furnish reasonably adequate service to the public and that its proposal here would not accomplish such end; that the public need for the present service outweighs the railroad's loss; that there is no showing that the operating loss between Wausau and Woodruff would materially affect the over-all operation of the railroad. It maintains, further, that the findings are supported by substantial evidence. It

denies that the findings and conclusions are arbitrary and capricious and argues that there is no constitutional question involved.

In *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 34 N. W. (2d) 238, and *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 56 N. W. (2d) 548, this court construed the term *"substantial evidence* in view of the entire record" as such appears in sec. 227.20 (1) (d), Stats., *supra*. We have adopted the view that *substantial evidence* is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. We have agreed with the interpretation stated in *Universal Camera Corp. v. Labor Board* (1951), 340 U. S. 474, 71 Sup. Ct. 456, 95 L. Ed. 456, that the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. We have also accepted the view as expressed in the opinion of that case that (p. 488) :

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the . . . [administrative board] as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the board's view."

The commission determined that the company's proposal is not consistent with the furnishing of reasonably adequate transportation service to the public; that the public need for the present train service outweighs the loss to the Railroad Company; that there is no showing that the operating loss resulting from the present train service between Wausau and Woodruff sought to be discontinued materially affects the over-all operations of the railroad.

In reviewing the commission's order with respect to the first point of the Railroad Company's challenge, it is incumbent upon the court to examine the entire record to ascertain whether there is substantial evidence to support the fact findings and ultimate conclusions upon which the commission's order is predicated.

It appears from records furnished by the Railroad Company and included in evidence before the commission that in the seven-month period October 1, 1951, to April 30, 1952, trains 200 and 201 carried on some or all of the run between Wausau and Woodruff an average of 29 passengers per trip, or a total of 12,339 passengers, resulting in an average of 13.9 passenger miles a train mile. For the comparable period in 1949–1950, the records indicated an average use by 38.6 passengers per trip or a total of 14,043. The Railroad Company points to the decline of patronage in the compared periods. The respondent insists that the patronage is still substantial despite the decrease.

The record indicates that a large portion of the traffic on trains 200 and 201 during said seven-month period made connections with main-line trains at New Lisbon. The average number of passengers on said train between New Lisbon and Wausau was 50, between Wausau and Merrill was 27, and north of Merrill 12.4. On southbound train 200, of 6,931 passengers carried in the seven-month period, 4,190 were through passengers originating north of Wausau at

stations beyond Wausau. On northbound train 201, of 5,408 passengers carried in the same period, 3,976 were passengers originating south of Wausau going to points north of Wausau. Southbound passengers carried to points up to and including Wausau were 2,741, and northbound passengers carried from Wausau and points north were 1,432. The total of all these passengers is 12,339.

The Railroad Company presented evidence that in its operation of the segment of the line from Wausau to Woodruff in the seven-month period October 1, 1951, to April 30, 1952, its total out-of-pocket expense was $53,112, and that its revenues amounted to $11,638, resulting in a net loss of $41,474 or $1.298 per train mile. The carrier's evidence indicates that in the identical seven-month period of 1949–1950 the loss per train mile was $.994. At present no mail revenue is derived by these trains whereas in 1949–1950 such revenue amounted to $1,697. The carrier's evidence tended to show that its operating cost on this part of the line increased substantially despite its efforts to reduce the same. It maintains that in view of rising expenses its net loss is bound to increase. However, the record discloses, also, that the operating results of these trains in the segment of the line from New Lisbon to Wausau resulted in an out-of-pocket gain of $38,791 and that when considering the operation of the entire line from New Lisbon to Woodruff the out-of-pocket loss was $41,474 less $38,791 or a total of $2,683. The respondent contends that if "dependent revenues," i. e., portion of the total fare paid by passengers coming or going from points beyond New Lisbon, were credited to the line between New Lisbon and Woodruff, the loss of the sum of $2,683 would disappear. Respondent is of a view that if these trains on the New Lisbon-Woodruff run were operated with one less car, a substantial saving would result. The respondent points to the failure of the Railroad Company to have produced evidence showing operations of the line from

New Lisbon to Woodruff on an *annual* basis. It contends that computation of operation on such basis would result in a showing of a profit, since there was testimony by a witness for the carrier that in the other (five-month) period the revenue was 90 cents per train mile as compared to 36.4 per train mile for the seven-month period in question. It is also the contention of the respondent that there is no assurance that by discontinuing trains 200 and 201 between Wausau and Woodruff, the segment of the line from New Lisbon to Wausau would continue to operate with an out-of-pocket profit of $38,791. It argues that the revenues of the 8,166 through passengers shown to have ridden the trains over the profitable segment of the line, were dependent upon the operation of what has been designated as the unprofitable portion of the line, and that hence the whole line must be considered as a single unit. It was stipulated of record that considering both freight and passenger revenues from New Lisbon to Woodruff, the line was operated at a profit.

Under its offer to substitute bus service for the discontinued train service, the Railroad Company proposes to enter into a contract with the Northland Greyhound Lines for the operation of passenger buses serving all points presently served by trains 200 and 201 between Wausau and Woodruff on substantially the same schedule as now exists. The Railroad Company would imburse the bus company at the rate of 50 cents per mile. It is estimated that the total cost under such contract would approximate $15,000 on the basis of the 1951–1952 experience. The carrier contends that under such proposed plan it could reduce its loss by $26,000.

The carrier presented evidence showing the result of a test run by a bus on the proposed route. The test indicated that the time schedule of the bus would virtually be the same as that of the trains, and that proper connections at Wausau between bus and train could be accomplished. However, the test run established that Brokaw, Harshaw, Goodnow, Rantz,

and Kawaga on the railroad line could not be served by the proposed substituted bus service, for the reason that the roads into those communities were of type or had weight limitations which would prevent the operation of an over-the-road bus to these railroad stations. On the basis that these five stations, which cannot be reached by bus, are located in small communities and that railroad patronage on these trains from those places during the winter months had proven meager, the Railroad Company, because of its inability to furnish such bus service now proposes an entire discontinuance of service to those stations during the period in question.

The record indicates that the normal capacity of a bus, such as offered in lieu of the train, is 37, but with "jump seats" the capacity is 47. Under the proposal, standard equipment would be provided from Stevens Point (30 miles south of Wausau) should need exist. On the basis of 1951–1952 patronage of these trains, the capacity of the bus would be exceeded 13 times on the run north from Wausau, and 15 times on the run south from Woodruff to Wausau. There were 426 train trips in the 1951–1952 period.

The respondent points to the discomfort of passengers using aisle seats; the inconvenience and discomfort of changing from train to bus and *vice versa;* delay and inconvenience to passengers in waiting for another bus. The appellant counters that the use of aisle seats would become necessary only infrequently. It challenges any assumption of delay or inconvenience because of nonavailability of equipment.

The desirability and safety of bus travel in the winter months in the area between Wausau and Woodruff was considered at the hearing, with conflicting views expressed by the witnesses as to such factors. Testimony was presented concerning road conditions with respect to ice and slipperiness; hills and curves; stalling of traffic during and after snow storms; the fact that travel was slower than ordinary during this season. Contra, there was testimony showing no

record of bus accidents in the area and the further fact that buses traveled regularly on routes near the railroad line in question. As to the respondent's contention that the elimination of one coach on each train in the area north of Wausau would effectuate a considerable saving, the appellant offered proof that such saving would not be appreciable. Respondent directs attention to the complete discontinuance of service provided by these trains presently to five towns on the line. In answer, the appellant asserts that in four of these places the patronage has been negligible and that in the other place the town (Kawaga) is actually a suburb of Wausau and could be served in that city.

Regarding availability and adequacy of other service there is testimony that trains 217 and 256 would still be operated although their running time would classify them as night trains instead of day trains. Northland Greyhound Lines furnishes bus service presently from Wausau to Woodruff, via Rhinelander, on a route partly different than is proposed here, and on a schedule not affording reasonable connections with trains 200 and 201. It appears that the Chicago & North Western Railway provides service through Woodruff from Chicago to Ashland. Highways near the segment of the railroad line in question afford opportunity for efficient travel by automobile.

That the Milwaukee Road sustained a loss in its operation of the trains in question on that part of the line between Wausau and Woodruff in the period October to April, inclusive, is plain. That there is still density of traffic and substantial use on this segment of the line is equally plain when it is considered that over 12,000 passengers patronized this service in such period, even though that number is somewhat less than for a previous comparable period. It appears also that this segment is still an important integral part of the New Lisbon-Woodruff line, both from the standpoint of use by

the public and the revenues derived. The combined passenger and freight operation yields a profit.

The amount of pecuniary loss sustained by a carrier, resulting from a regulatory commission order requiring the continuance of transportation service, is but one factor in determining whether such order is reasonable. Unless the loss, in light of all other material facts, renders the order unreasonable, such loss is not sufficient, standing alone, to render the commission's order invalid. As long as a carrier exercises its privilege of doing business, it has a primary duty of furnishing reasonably adequate service to the public, which duty may be compelled, even if by so doing a pecuniary loss may result. *Chicago, M., St. P. & P. R. Co. v. Public Service Comm.* (1951), 260 Wis. 212, 50 N. W. (2d) 416.

The problems raised by the discontinuance of trains cannot be resolved alone by reference to the carrier's loss in operation, but depend more upon the predominantly local factor of a public need for the service rendered. *Alabama Public Service Comm. v. Southern R. Co.* (1951), 341 U. S. 341, 71 Sup. Ct. 762, 95 L. Ed. 1002.

In *Chesapeake & Ohio R. Co. v. Public Service Comm.* (1917), 242 U. S. 603, 607, 37 Sup. Ct. 234, 61 L. Ed. 520, the court said:

"One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss. *Atlantic Coast Line Railroad Co. v. North Carolina Corporation Commission,* 206 U. S. 1, 26; *Missouri Pacific Ry. Co. v. Kansas,* 216 U. S. 262, 279; *Oregon Railroad & Navigation Co. v. Fairchild,* 224 U. S. 510, 529; *Chicago, Burlington & Quincy R. R. Co. v. Wisconsin Railroad Commission,* 237

U. S. 220, 229. That there will be such a loss is, of course, a circumstance to be considered in passing upon the reasonableness of the order, but it is not the only one. The nature and extent of the carrier's business, its productiveness, the character of service required, the public need for it, and its effect upon the service already being rendered, are also to be considered."

At the hearing before the commission, upon review before the trial court, and here, the appellant interposed objection to the consideration given by the commission to the record of operation (as to patronage and financial experience) of these trains on that part of the line between New Lisbon and Wausau. The carrier contends that such matter is irrelevant to the issues here. However, it appears from the evidence, that approximately two thirds of the 12,339 passengers using these trains north of Wausau are through passengers from and to points south of Wausau. A large proportion of these make connection with the main line at New Lisbon. We are of opinion that evidence concerning operation of these trains on the part of the line south of Wausau is pertinent to a consideration of the issues, and that the commission's inclusion of such items in its determination, was proper.

We concur in the observation of the commission and in its conclusion that:

"There are two salient features present in this particular proceeding which are not present in most passenger-train cases. One feature is the fact that the entire operation of a particular train is not involved. The application in this proceeding is to shorten the routes of particular trains rather than to discontinue the total operation of those trains. The other distinguishing feature is that the application is to discontinue part of the run for only part of the time, October 1 to April 30, inclusive, each year.

"This characteristic in traffic, which results in certain portions of the operations deriving benefits from traffic coming from or going to other portions of the operations, makes it necessary to give more weight to consideration of the over-all

operations of the particular trains. There are two viewpoints to be considered when giving weight to the total operation of the trains:

"(a) Whether the loss of total operation was so great that the elimination of part of the operation was necessary to preserve the other part of the operation.

"(b) Whether the loss of the total operation is not such as to warrant curtailment if the public need requires the total operations.

"The commission is of the opinion that the facts in this proceeding place the operations of trains 200 and 201 in the second category mentioned above. Because of that, it is deemed important to stress the balancing of the carrier's loss from the total operation of the trains involved with the inconvenience and hardship to the public if the service is discontinued on a part of the total operation."

The carrier objects to the conclusion of the commission that:

"There is no showing that this operating loss between Wausau and Woodruff materially affects the over-all operation of the railroad."

The carrier contends that consideration of the railroad's entire operation or financial condition is irrelevant to issues here. However, we are obliged to hold that the entire operation or financial condition of a railroad company is a fact properly to be considered when determining its application to discontinue some unremunerative service on the line. *Milwaukee Electric R. Co. v. Milwaukee* (1920), 252 U. S. 100, 40 Sup. Ct. 306, 64 L. Ed. 476. In *In re New Jersey & New York R. Co.* (1953), 12 N. J. 281, 96 Atl. (2d) 526, where the New Jersey commission denied permission to discontinue a train, the court said (p. 289):

"Inasmuch as the railroad's operating loss, both as to its entire system and as to the particular train in question, is a factor to be considered by the board, the railroad has the duty

to present proof of the propriety of its expenditures and to establish that its operating deficiency is *bona fide*.

"Secondly, the railroad contends that the proofs submitted were such that the board should have found that the public convenience and necessity did not require the continued operation of train 613. In other words, it argues that the board's decision was unreasonable since the operating loss to the railroad outweighed any public inconvenience that might arise from the discontinuance of the train. This contention cannot be sustained. First of all, one of the important elements to be considered where public convenience and necessity is the test is the financial success of the railroad as a whole as well as of the particular train sought to be discontinued."

In *Fort Smith L. & T. Co. v. Bourland* (1925), 267 U. S. 330, 42 Sup. Ct. 249, 69 L. Ed. 631, cited with approval in *Northern States P. Co. v. Public Service Comm.* (1944), 246 Wis. 215, 226, 16 N. W. (2d) 790, it was said (p. 332):

"A railway may be compelled to continue the service of a branch or part of a line, although the operation involves a loss. *Missouri Pacific Ry. Co. v. Kansas,* 216 U. S. 262, 279; *Chesapeake & Ohio Ry. Co. v. Public Service Commission,* 242 U. S. 603, 607. Compare *Railroad Commission v. Eastern Texas R. R. Co.* 264 U. S. 79, 85. This is true even where the system as a whole fails to earn a fair return upon the value of the property. So far as appears, this company is at liberty to surrender its franchise and discontinue operations throughout the city. It cannot, in the absence of contract, be compelled to continue to operate its system at a loss. *Brooks-Scanlon Co. v. Railroad Commission of Louisiana,* 251 U. S. 396. But the constitution does not confer upon the company the right to continue to enjoy the franchise or indeterminate permit and escape from the burdens incident to its use."

In the absence of a showing that the loss of $2,683 for the seven-month operation of the line materially affected the overall operation of the carrier, and especially bearing in mind

that computation on an *annual* basis would probably reflect an out-of-pocket gain, we are unable to declare as a matter of law that such loss would overweigh a proper finding of need for the service.

Because of the Milwaukee Road's contention that this is not a discontinuance of transportation service in the area, but merely a substitution of facility, it became necessary for the commission to determine the adequacy of the service proposed. It appears that the evidence on this subject was such upon which reasonable minds might well come to different conclusions. True, the time schedule of the bus service would be practically identical with that of the train service. In other respects, however, the evidence tends to show that the proposed service of bus and train are not alike. Foremost, amongst the differences detailed in the record are the following : The preference of many people to rail service over bus service and their use of the same; the discomfort and inconvenience of changing from rail to bus, or *vice versa,* in inclement weather; the fact that the seating capacity of the bus would be exceeded at times despite the use of "jump seats;" the fact that the bus operating in the wintertime over the highways available would not be as desirable or safe as bus operations elsewhere; the fact that five communities would be deprived of the present service. It is recognized that the appellant has challenged the merit of several of these items, but we consider that it was within the province of the commission to determine them, and that its findings with respect thereto are supported by substantial evidence. It may be said that the evidence and views of the respective parties as to these items are fairly conflicting, but it is not within the power of the court to displace the board's choice.

Appellant contends that its proposed plan is comparable to that approved by the commission in a rather recent application affecting the Monico-Land O'Lakes section of the Chicago & North Western Railway Company's line. Although the

commission's docket of that case is not before us, it appears that the trial court which determined this cause, also determined that. In his memorandum opinion of this case the trial court directs attention to the fact that in the Monico-Land O'Lakes situation the patronage of the train was less than one passenger per day. Here, more than 12,000 passengers patronized the service in a seven-month period. The views of the learned trial court, as expressed in its opinion, show the difference of situation. The court said:

"The public is using the Milwaukee Road north of Wausau. The public was not using the North Western north of Monico. . . . There is density of traffic in the case at bar. That is why a proper balance of the railroad's inconvenience or even loss must be thrown against the public interest; . . ."

The commission determined that the use and need of these trains by more than 12,000 people in seven months was substantial, and that bus substitution would not be consistent with the rendition of reasonably adequate service to the public. The commission's finding in this regard is sustained by substantial evidence.

In advancing its argument as to what constitutes reasonably adequate service or what is required by public convenience and necessity under modern conditions, the appellant relies in part and cites *In re Application of Chicago, B. & Q. R. Co. v. Holdrege* (1950), 152 Neb. 352, 41 N. W. (2d) 157. It directs special attention to the observation there made, that (p. 363) :

"The court cannot close its eyes to conditions as they exist and which are well known to everyone. A railroad company has but limited powers of management. It has no final power to fix rates, therefore little control over its revenue. Its control over expenses, particularly wages, is strictly limited. In managerial functions it is restricted by rules arising from contracts with well-integrated and nation-wide labor organizations. It is the duty of a carrier to seek, and of regulatory

agencies to permit, the elimination of those services and facilities that are no longer needed or used by the public to any substantial extent. See *Atlantic Coast Line R. R. Co. v. Public Service Commission, supra; Blease v. Charleston & W. C. Ry. Co., supra.*

"In determining whether public convenience or necessity requires the continuance of trains 151 and 152, the rules announced in older legal precedents established prior to the transportation revolution wrought by public highways, private automobiles, certificated bus, and common-carrier trucks and private trucks carrying commodities to customers, are no longer applicable, for the reason that the same have not only destroyed the railroads' former monopoly of the passenger-transportation business, but it has also made the local passenger train an obsolete form of transportation."

The carrier also cites *Illinois Central R. Co. v. Illinois Commerce Comm.* (1951), 410 Ill. 77, 85, 101 N. E. (2d) 588, wherein it was said:

"In determining questions of public convenience and necessity today, consideration must be given to the fact that railroads no longer have a monopoly of transportation. Older decisions, requiring the continuance of particular passenger-train services even though conducted at a loss, were rendered in a period when railroads provided the principal source of land transportation. Horse-drawn vehicles provided little if any competition. Today, on the other hand, railroads are in competition with bus and truck lines as well as private automobiles traveling over a vast system of improved highways built, not by private capital as is the case with rail carriers, but by public expenditures. They are in competition also with government subsidized waterways and, in recent years, with the expanding activities of air lines. In the light of such changed conditions it is a duty of the carrier to seek, and of the regulatory agency to permit, elimination of uneconomic services no longer needed or used by the public to any substantial extent. The reasons which originally may have provided justification for compulsory facilities maintained at substantial losses have largely disappeared today, rendering local train service in many cases an obsolete form of trans-

portation. Recognition of such factors by regulating bodies not only results in financial benefit to the railroads but, by eliminating unnecessary passenger-train service, makes possible more economical transportation for the public on the trains which remain in substantial demand."

While these cases indicate the vast change that has occurred in the matter of need and use of railroad-passenger service due to other available methods of transportation which have been developed, it is significant that they still hold to the rule that where substantial losses result from the operation, the *test* to be applied is whether the loss outweighs the public benefit or convenience. In the case at bar the commission balanced the carrier's loss with the inconvenience and hardship to the public were the trains to be discontinued, and determined that the public need outweighed the railroad's loss. It is apparent that in determining the proposal of bus substitution, the commission amongst other factors, especially considered the density of traffic between Wausau and New Lisbon and the scarcity of available service to a number of stations located on the line. Its conclusion in this respect is based on substantial evidence.

The appellant also charges that the commission's findings, inferences, and conclusions are contrary to the railroad's rights and privileges in that they are arbitrary, unreasonable, and confiscatory under the Fourteenth amendment of the United States constitution. Appellant argues that a common carrier is protected by the United States constitution against confiscation; and the police powers of the states are subject to the limitation that the property of a common carrier cannot be taken without just compensation or without due process of law. However, it is to be noted, as was said in *Alabama Public Service Comm. v. Southern R. Co.* (1951), 341 U. S. 341, 352, 71 Sup. Ct. 762, 95 L. Ed. 1002, that:

"It has long been settled, however, that a requirement that a particular service be rendered at a loss does not make such

a service confiscatory and thereby an unconstitutional taking of property."

Other cases holding to such principle are: *St. Louis & San Francisco R. Co. v. Gill* (1895), 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; *Atlantic Coast Line R. Co. v. North Carolina Corporation Comm.* (1907), 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933; *Missouri Pacific R. Co. v. Kansas* (1910), 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472; *Chesapeake & Ohio R. Co. v. Public Service Comm.* (1917), 242 U. S. 603, 37 Sup. Ct. 234, 61 L. Ed. 520; *Puget Sound T., L. & P. Co. v. Reynolds* (1917), 244 U. S. 574, 37 Sup. Ct. 705, 61 L. Ed. 325; *Fort Smith L. & T. Co. v. Bourland* (1925), 267 U. S. 330, 42 Sup. Ct. 249, 69 L. Ed. 631.

Considering the need for the service as determined by the commission, it does not appear that the obligation imposed upon the carrier to continue its operation at a loss of $2,683 for a seven-month period, in light of its other financial experience on the line, is confiscatory.

In its final challenge to the commission's order and expressly on the ground that it is arbitrary and capricious, the Railroad Company refers in large measure to the differences in the findings in the Monico-Land O'Lakes determination, where substituted bus service was permitted, as compared with the findings here, principally with reference to the safety of highway traffic in the wintertime; the availability of extra bus equipment in the event of an overflow capacity; the matter of dependent revenues. The docket in the Chicago & North Western Railway Company's application to substitute bus service on that part of its line from Monico to Land O'Lakes is not before us, and we cannot test for alleged inconsistencies of finding. However, it is not within our province to determine whether the findings of the commission here are consistent with those made by it in another case. In *Virginian R. Co. v. United States* (1926), 272 U. S. 658, 41 Sup. Ct. 222, 71 L. Ed. 463, the court declared (p. 663):

"To consider . . . whether the findings are consistent with those made by it [the commission] in other cases, is beyond our province."

In *Dairy Employees Ind. Union v. Wisconsin E. R. Board* (1952), 262 Wis. 280, 282, 55 N. W. (2d) 3, this court held that:

"A determination made by an administrative agency is not the exercise of a judicial function; it is an administrative act merely and has not the force of the judgment of a court. *Duel v. State Farm Mut. Automobile Ins. Co.* 240 Wis. 161, 1 N. W. (2d) 887, 2 N. W. (2d) 871; *State ex rel. Schleck v. Zoning Board of Appeals,* 254 Wis. 42, 35 N. W. (2d) 312. Its ruling relates only to the facts and conditions presented upon the pending proceeding. It is not bound by its prior determinations, 73 C. J. S., Public Administrative Bodies and Procedure, p. 480, sec. 147."

In view of the commission's finding supported by substantial evidence, that the Railroad Company's proposal is not consistent with the furnishing of reasonably adequate service to the public, it follows that its order is not capricious or arbitrary, since it has a rational basis. *Interstate Commerce Comm. v. Jersey City* (1944), 322 U. S. 503, 64 Sup. Ct. 1129, 88 L. Ed. 1420.

It is ordered that the judgment of the circuit court for Dane county sustaining the finding and order of the Public Service Commission be affirmed.

*By the Court.*—Judgment affirmed.