IN RE APPLICATION OF CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY.
CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPLICANT, APPELLANT, V. NEBRASKA STATE RAILWAY COMMISSION ET AL., APPELLEES.

295 N. W. 389

FILED DECEMBER 20, 1940.   No. 31046.

*J. W. Weingarten* and *W. P. Loomis,* for appellant.

*Anderson, Storms & Anderson* and *L. A. Sprague, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, MESSMORE and JOHNSEN, JJ.

ROSE, J.

This proceeding was commenced before the Nebraska state railway commission and there prosecuted to a final order. The Chicago, Burlington & Quincy Railroad Company, a common carrier of passengers and freight in Nebraska and in other states, applied for permission to discontinue motor passenger trains numbered 97 and 98 which are operated daily except Sunday on the branch line of railroad between Beatrice and Holdrege. Between those cities, the towns and stations, east and west, are Hoag, DeWitt, Swanton, Western, Tobias, Ohiowa, Strang, Shickley, Ong, Edgar, Deweese, Lawrence, Rosemont, Blue Hill, Bladen, Campbell, Upland, Hildreth, Wilcox, and Sacremento. The municipalities named appeared before the commission by counsel and remonstrated against the granting of the application. On issues raised by formal pleadings, the commission, after hearing the parties at length, made

findings of fact against applicant and in favor of remonstrants and dismissed the proceeding. Applicant appealed to the supreme court and submitted for review the sufficiency of the evidence to sustain the order.

The problem presented to the commission involved regulation of public transportation services. The commission acquired jurisdiction and had power under the Constitution and statutes to consider and determine the issue. Const. art. IV, sec. 20; Comp. St. 1929, sec. 75-201. The only question on appeal therefore is the sufficiency of the evidence to prove that the order denying the applicant permission to discontinue motor passenger trains 97 and 98 was not unreasonable or arbitrary. *Furstenberg v. Omaha & C. B. Street R. Co.*, 132 Neb. 562, 272 N. W. 756. Where, however, a final order of the commission depriving a common carrier of substantial rights is based on findings without support in the evidence, it is unreasonable, arbitrary and reversible on appeal. *Northern P. Ry. Co. v. Department of Public Works*, 268 U. S. 39, 45 S. Ct. 412; *Publix Cars, Inc., v. Yellow Cab & Baggage Co.*, 130 Neb. 401, 265 N. W. 234. This court in discussing the regulatory powers and duties of the commission in respect to services of common carriers unanimously adopted the following views of the law:

" 'The prime object and real purpose of commission control is to secure adequate sustained service for the public at the least possible cost, and to protect and conserve investments already made for this purpose. Experience has demonstrated beyond any question that competition among natural monopolies is wasteful economically and results finally in insufficient and unsatisfactory service and extravagant rates. Neither the number of the individuals demanding other service nor the question of fares constitutes the entire question, but rather what the proper agency should be to furnish the best service to the public generally and continuously at the least cost. Anything which tends to cripple seriously or destroy an established system of transportation that is necessary to a community

is not a convenience and necessity for the public and its introduction would be a handicap rather than a help ultimately in such a field.' 3 Pond, Public Utilities (4th ed.) sec. 775." *Publix Cars, Inc., v. Yellow Cab & Baggage Co.,* 130 Neb. 401, 265 N. W. 234.

In the same case the court ruled that consideration should be given to the public rather than to individuals.

A ruling based on the abandonment of an unprofitable branch line of railroad, while its entire mileage is operated at a profit, is not necessary to a decision on this appeal and decisions of administrative boards and opinions of courts on such a problem are not controlling herein. The question is narrowed to the finding of the commission that applicant is not, under existing conditions as disclosed by the evidence, entitled to a regulatory order permitting it to discontinue motor passenger trains 97 and 98 on its branch line of railroad between Beatrice and Holdrege. Transportation of passengers by steam-engine trains on this line was profitable before the advent of automobiles, private trucks, common carrier trucks and public highways adapted to the use of the new motor vehicles. Much of the evidence on both sides was directed to changed conditions resulting from the new methods of transportation. Such changes were inevitable and railroad transportation must be adjusted to existing conditions if it is to survive. Long survival without earning capacity or profit is impossible.

The Chicago, Burlington & Quincy Railroad Company, applicant, operates 151 miles of railroad between Beatrice and Holdrege. Its entire mileage in Nebraska is practically 3,900 miles and it has a vast mileage of connecting lines in other states. The grounds on which applicant relies for the relief sought by it may be summarized generally as follows: The primary purpose of the motor trains was transportation of passengers. Incidental thereto the service included the carrying of mails, express, baggage, cream and other commodities transportable in a one-unit motor train. The use of private automobiles and public motor passenger buses or coaches on improved highways,

paralleling or crossing applicant's branch line, reduced the passenger service thereon almost to the vanishing point. Trains 97 and 98 are no longer needed for passenger traffic and are operated at a loss which places an unreasonable and unnecessary burden on the main railroad lines of applicant and on interstate commerce. If these trains are abandoned, all adequate transportation facilities and public services for passengers, baggage, mails, express and freight in all the towns and territory along this line will be furnished by other trains thereon, by other railroad lines of applicant, by lines of other railroad companies operating in the same territory and by common carrier trucks and motor coaches. In brief, the foregoing propositions indicate generally the position taken by applicant.

Evidence in support of the application tends to prove the following facts and inferences therefrom: The motor passenger trains operate daily except Sunday between Beatrice and Holdrege. According to the schedules, train 98 leaves Holdrege at 6:40 a. m. and arrives at Beatrice at 12:08 p. m. and 97 leaves Beatrice at 1:00 p. m. and arrives at Holdrege at 6:34 p. m. The average number of travelers on these trains per train mile did not amount to two passengers for the years 1937, 1938 and 1939 and they were not used generally by the public for transportation of passengers during those years. The expenses of operating this branch line during that period exceeded the revenues at least $500 a month and to that extent was a burden on other lines. On the line between Beatrice and Holdrege applicant operates mixed-service steam trains numbered 102 and 103. They are equipped to carry passengers, express, baggage, cream and freight and have the facilities and connections for receiving and forwarding daily shipments at or near the towns along the Beatrice-Holdrege line. Train 102 is scheduled to leave Holdrege on Tuesdays, Thursdays and Saturdays at 5:50 a. m. and arrive at Beatrice at 3:35 p. m. Train 103 is scheduled to leave Beatrice on Mondays, Wednesdays and Fridays at 9:20 a. m. and arrive at Holdrege at 7:30 p. m. This service will remain if trains 97 and 98 are

abandoned. In that event the federal government will provide for the handling of mail now carried by applicant on those trains. Freight railroad traffic with resulting revenue in this territory has been greatly reduced by motor trucks operating on improved highways. Some wholesale merchants use private trucks to deliver merchandise to their retail customers. To a great extent cream and other farm products are taken to market by farmers in their own motor cars. By these methods and other means, the revenues arising from applicant's transportation of freight on this line have been greatly reduced. The main purpose of the application is to reduce operating costs of this branch line and preserve it for public service.

The question presented by the appeal as understood by counsel for remonstrants is the same as already indicated and has been stated by them in this form:

"As the authority of the commission to grant or deny the application of the company is not challenged and cannot be challenged because of this court's previous holdings, the only substantive issue before the court is whether the order of the commission denying the application is supported by evidence showing that such order is not unreasonable or arbitrary."

In the argument on this question the evidence is discussed at length on behalf of remonstrants. Many witnesses residing in the towns or territory along the Beatrice-Holdrege branch line testified in favor of the remonstrants, but their testimony is too voluminous to recite in detail. The general import of it, however, including inferences, conclusions, opinions and forecasts of witnesses is indicated by the following summary: The record of railroad operations on this branch line covers the period since 1886 and estimates of earnings, expenses and losses in revenue for the years 1937, 1938 and 1939 are not conclusive since the business during the 10-year period ending at the close of 1939 shows a profit and the net earnings in 1939 prove an increase over 1937 and 1938. The main lines of applicant are operating at a profit. The discontinuance of trains

97 and 98 would leave the municipalities along this branch line without adequate mail, express and passenger services. The years 1937, 1938 and 1939 were not normal for this territory on account of continuous drought which destroyed crops and interfered with the live stock industry—the two principal commodities for transportation. Rainfall and snow at the time of the trial and previously indicate a more prosperous season for 1940. The live stock industry is reviving owing to the cultivation of crops adapted to the dry climate and resulting production of more feed for cattle. Chambers of commerce, city councils, municipal officers, merchants and others have assumed a friendly attitude toward applicant and have united in efforts to increase its business as a common carrier and to curb transportation by motor trucks operating in the same territory. To this end some town councils have passed ordinances imposing occupation taxes on operators of trucks. Other councils have been urged to pursue the same course. There is a general movement to turn transportation business back to the applicant and to prevent the abandonment of trains 97 and 98. Trains 102 and 103 do not run on schedule time and will not provide adequate mail and express service. Some of the county roads to and from towns along the branch line have been blocked by snow and at other times rains have made them dangerous and unfit for mail and express routes.

Testimony of the character indicated by the foregoing summary was multiplied by witnesses opposing the application, but notwithstanding such testimony and all evidential facts in the record, trains 97 and 98, operated as passenger trains, are practically obsolete. Income from passenger traffic, averaging less than two passengers per train mile, is out of all proportion to the cost of operation as shown by uncontradicted evidence. There is no public necessity for exclusive passenger trains operated as such without compensable revenue nor is there any competent probative evidence of a material increase. Witnesses generally came to the hearing before the commission in private

automobiles. They were prompted by natural impulses to do so. They preferred a convenient, speedy and comfortable way to travel on highways constructed and improved at public expense. They started from their own doors. They were not hampered by railroad time tables or limited in speed by motor trains or delayed by stops at stations. It is expecting too much of human nature, of optimism, of forecasts for moisture, and of proper attitude toward the railroad company, to find that trains 97 and 98, if continued, will be substituted for automobiles in the transportation of passengers between Beatrice and Holdrege. Conditions of railroad transportation have changed since 1886, when this branch line was constructed, and the revenues during the entire intervening period are not proper measures of earnings and expenses under present changed conditions. Earnings and expenses since 1932, a period suggested by remonstrants for computations, are not proper measures of present or future profits and losses. Applicant must reckon with conditions resulting in present losses. The slight decrease in the loss occasioned by the operation of the motor passenger trains in 1939 was due in part to dismissal of one member of a train crew. Neither the evidence nor the findings of the commission show a public necessity for trains 97 and 98 as means of transporting passengers between Beatrice and Holdrege, when the daily service, equipment and connecting links of trains 102 and 103 are considered with other available services of applicant and of other common carriers.

Do the franchises and public duties of applicant require it to operate these passenger trains for the incidental purposes of transporting United States mails, express and cream? It is not a duty of a railroad common carrier to run passenger trains at heavy monthly losses for years on a branch line of railroad after such trains have been abandoned by the public for general and ordinary passenger traffic producing only a small decimal of operating expenses, where adequate facilities and public services are provided by daily mixed-service trains carrying passengers,

mail, express and freight, and by other public utilities. Motor passenger trains operated on a branch line of railroad at a loss may properly be discontinued, where adequate public transportation is otherwise furnished, though the main line is operated at a profit. More moisture and resulting prosperity, anticipated by witnesses, are not likely to so change human nature as to turn short-trip passenger traffic, generally in rural communities, from automobiles to motor trains on railroads. Ordinances imposing occupation taxes have not yet materially lessened transportation by motor buses and motor trucks in this territory and the evidence so proves. If, in the future, there should be any unreasonable departure from the schedules of trains 102 and 103, the regulatory power of the Nebraska railway commission will be available to the public for corrective remedies. It should not be assumed or found, in absence of evidence, of which there is none, that county officers will fail to perform their duty to keep county roads in a reasonably safe condition for mail and express routes and for other public purposes; nor that the postmaster general of the United States will fail to perform his duty to furnish adequate mail services for the people residing along this branch line of railroad.

The examination and consideration of all the evidence lead to the conclusions that the operating expenses of passenger trains 97 and 98 far exceed the revenues therefrom; that those trains are not needed by the public for passenger traffic; that the continuous operation of trains 102 and 103 and of other utilities will furnish the public in this territory with adequate transportation for passengers, mail, express, cream and freight. In these views of the record, the final order denying applicant permission to discontinue trains 97 and 98 is based on findings without support in the evidence and for that reason is.unreasonable and arbitrary within the meaning of the law.

REVERSED AND REMANDED.

JOHNSEN, J., not participating.