IN RE APPLICATION OF CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT, v. NEBRASKA STATE RAILWAY COMMISSION, APPELLEE.

41 N. W. 2d 165

Filed February 9, 1950. No. 32760.

*J. W. Weingarten* and *W. P. Loomis*, for appellant.

*Perry & Perry, Thomas L. McCullough,* and *Alfred D. Raun,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

The Chicago, Burlington & Quincy Railroad Company commenced this proceeding before the Nebraska State Railway Commission to secure permission to discontinue motor passenger trains numbered 15 and 16 which are operated daily between Lincoln, Nebraska, and the Iowa-Nebraska state line near Sioux City, Iowa. No formal objections were filed to the application, but citizens from five of the communities served by the trains in question appeared and testified in opposition to their discontinuance. The commission, after public hearing, denied the application and the railroad company appeals.

Trains Nos. 15 and 16 are operated between Lincoln, Nebraska, and Sioux City, Iowa. The intermediate stations served are Havelock, Waverly, Greenwood, Ashland, Wann, Yutan, Leshara, Fremont, Nickerson, Winslow, Uehling, Oakland, Lyons, Rosalie, Walthill, Winnebago, Homer, Dakota City, Ferry, and South Sioux City, all in Nebraska. The first four-named stations are on the main line of the Burlington, the remainder being on a branch line running between Ashland and Ferry. From Ferry, Nebraska, to Sioux City, Iowa, a distance of 2.5 miles, the trains operate over the tracks of the Chicago, St. Paul, Minneapolis & Omaha Railway Company. From Lincoln to Ashland it is 24.34 miles. From Ashland to the state line near Sioux City it is 106.64 miles.

Fremont is the largest intermediate point between Lincoln and Sioux City with a population of approximately 12,000. Ashland, Oakland, Lyons, and Walthill range in population from 1,700 to 1,000. The other towns served vary from a population of 800 to very small unin-

corporated communities. Agents are not maintained at Wann, Leshara, Nickerson, Homer, and Dakota City. Objections were voiced by persons residing at Leshara, Lyons, Rosalie, Walthill, and Winnebago.

Train No. 16 is scheduled to leave Lincoln at 8:30 a. m. daily and to arrive at Sioux City at 12:55 p. m. Train No. 15 leaves Sioux City at 1:30 p. m. daily and arrives at Lincoln at 5:55 p. m. The train consists of a 275-horse-power, gas-electric motor car with space for a railway post office, and express and baggage. A trailer car is attached which provides space for 58 passengers and additional express and baggage.

The record shows that during the 12-month period ending with April 1949, the intrastate loss in operation of these two trains between Lincoln and the state line near Sioux City was $23,679. Including the interstate loss, the loss sustained in operating the trains between Lincoln and Sioux City was $35,471. Included in the earnings is an item of $16,987 received from the government on mail contracts. The record shows that the government will discontinue the use of trains Nos. 15 and 16 for transporting mail after January 1, 1950. This will increase the loss by a similar amount after that date.

During the same 12-month period, train No. 16 carried a daily average of 13.11 passengers and train No. 15 a daily average of 14.24 passengers, both intrastate and interstate. The average number of intrastate passengers carried on these two trains was 8.1 and 9.5 respectively. During the same period train No. 16 carried an average of 5.9 passengers per train mile and train No. 15 an average of 6.4 passengers per train mile. During the period train No. 16 averaged 2.4 intrastate passengers per train mile. On train No. 15 this average was 2.7 passengers. The total passenger revenue on train No. 16 was 13.85 cents and on train No. 15 it was 14.81 cents per train mile. The wages alone paid the three-man crew on these trains were 27.15 cents per train mile. A great loss in passenger traffic has taken place on this line since

1923. During the war years an increase occurred, but with the passing of the war emergency the decline has followed the previous downward trend.

The railroad company proposes, if the application be granted, to replace the two daily passenger trains with a tri-weekly mixed train. This train will carry passengers, express, cream, and other head-end shipments. Mail service will be otherwise provided by the postal department of the government. Bus lines operate over the whole territory and will augment the passenger service afforded on the tri-weekly trains. Other railroads operate into several of the communities now served by trains Nos. 15 and 16. Passenger traffic between Lincoln and Sioux City can be handled by way of Omaha. Fremont is on the main line of another transcontinental railroad. The evidence shows that passenger traffic between intermediate points is largely by privately-owned automobiles and regularly scheduled bus lines. The small number of persons making use of these trains and the evidence that other forms of transportation are being used in preference to railroad travel conclusively establish an abandonment of the passenger facilities of the railroad in favor of other methods of travel.

The evidence shows that the Lincoln-Sioux City branch line is operated at a profit. The territory served by it is almost wholly agricultural. The freight handled over the line is very profitable, while the passenger service results in heavy loss. The record shows as we have herein cited that the public makes little use of the passenger service afforded. The discontinuance of the two trains in question will cause inconvenience to a few persons and businesses. This is not a criterion to be considered, however, when other forms of transportation are available and preferred. It is upon evidence conclusively establishing the foregoing facts that the commission denied the applicant permission to discontinue trains Nos. 15 and 16.

The question presented by the appeal is whether the

commission acted unreasonably and arbitrarily in denying the application. The jurisdiction of the commission is not questioned.

In determining whether or not the order of the commission complained of is unreasonable and arbitrary, the purposes which were intended to be accomplished when the commission was empowered to regulate and control the operation of the railroads as common carriers become important.

The business of operating and maintaining a railroad is a natural monopoly. It has been demonstrated in the past that competition among natural monopolies is wasteful economically and generally results in insufficient and unsatisfactory service and excessive rates. The primary purpose of commission control is to secure adequate, sustained service for the public at the lowest possible cost, and at the same time to protect and conserve investments already made in the furtherance of this purpose. It is not the province of a railroad company after assuming the status of a common carrier to accept the benefits derived from such a status and to refuse to perform or neglect the duties and responsibilities which such a status imposes. While the railroad company is relieved of the necessity of meeting unnecessary and wasteful competition, it is required to meet all the needs of the territory it serves. It may not at will abandon lines or trains, or even particular types of service that railroads customarily perform. It is, therefore, a question of public need that is to be determined when application is made for additional service or to discontinue an existing service. In determining such questions the cost of providing the service is an important element, although not a controlling one. It is contemplated that a railroad company shall provide adequate and comprehensive service to the public in the territory which it serves. The fact that some one of the services rendered is not self-sustaining is not important except as it bears upon the question of the public need for the particular

service. Such duties and responsibilities of a common carrier are taken into consideration by rate-making bodies in the fixing of rates and charges.

In former times the railroad was the chief means of transportation. The horse and buggy provided little if any competition. The traveling public depended almost entirely upon train service. Grain, livestock, and produce were transported almost exclusively by rail. The hauling of incoming freight and express was a primary function of the railroad. The conditions which required the railroads to perform these services exclusively no longer exist. The development of the public highway system and the common use of the automobile have materially changed the problem of passenger transportation. The establishment of schedule-operated bus lines, themselves common carriers, has proven more convenient to the traveling public. Truck lines established as common carriers carry grain, livestock, freight, and express, and thereby drain away from the railroad a large part of the revenue derived from this source. These new developments simply mean that an investigation of the facts must be made in each particular case in the light of these changed conditions.

The evidence in the case before us shows that the public prefers to use private automobiles for travel because of the convenience which it affords. Bus lines provide better and more convenient stand-by passenger service than do the railroads. It is argued that better train service would provide more users of railroad facilities. The record does not support any such conclusion. More adequate and convenient methods of transportation have brought about an abandonment of railroad passenger facilities in the communities affected by a discontinuance of trains Nos. 15 and 16. The record shows that the need for the service provided by these trains has been absorbed by other adequate methods of transportation. The little use made of the passenger service offered on trains Nos. 15 and 16, as shown by the record, affords

most convincing proof of this fact. We know of no rule that requires a railroad to maintain the operation of trains at great loss where the need for the service no longer exists. To require such operation constitutes one of the forms of economic waste which the commission was created to eliminate. The record before us conclusively shows that need does not exist for the maintenance and operation of these two trains for the reason that the public prefers and has adopted other methods of transportation. The need for service having disappeared, an order of the commission denying its discontinuance is arbitrary and unreasonable.

The application in the instant case was properly presented to the commission by virtue of constitutional and statutory authority. Art. IV, § 20, Constitution of Nebraska; § 75-201, R. S. 1943. This court on appeal will determine whether the final order made by the commission was arbitrary and unreasonable. Where the evidence, as here, shows that passenger trains are operated at a loss and for the operation of which no public need exists, a final order of the commission denying a railroad company permission to discontinue them is unreasonable and arbitrary. The legal principles supporting these conclusions are more definitely set forth in In re Application of Chicago, B. & Q. R. R. Co., 138 Neb. 767, 295 N. W. 389, and in In re Application of Chicago, B. & Q. R. R. Co., ante p. 352, 41 N. W. 2d 157.

In this view of the record the final order denying applicant permission to discontinue trains Nos. 15 and 16 is based on findings not supported by the evidence and for that reason it is unreasonable and arbitrary within the meaning of the law applicable thereto. The order of the commission is vacated and. the issues raised by the application are remanded to the commission for further consideration in accordance with the principles announced herein.

REVERSED AND REMANDED.