# 𝔖taunton

HANSEL FLEMING, ET ALS. V. COMMONWEALTH OF VIRGINIA,
EX REL. CLINCHFIELD RAILROAD COMPANY.

September 6, 1950.

Record No. 3706.

Present, Hudgins, C. J., and Gregory, Eggleston, Buchanan and Miller, JJ.

The opinion states the case.

*W. G. Burnette*, for the appellants.

*James J. McLaughlin, A. K. McIntyre* and *A. G. Lively*, for the appellee.

GREGORY, J., delivered the opinion of the court.

The Clinchfield Railroad Company filed a petition on June 24, 1949, asking that it be allowed to curtail the operation of two of its passenger trains in Virginia which are operated daily between Spartanburg, South Carolina, and Elkhorn City, Kentucky, and return, a distance of 277 miles. The trains involved are Nos. 37 and 38, and are local trains making many stops. This railroad operates through Kentucky, Virginia, Tennessee, North and South Carolina. In Virginia its line runs through Dickenson, Scott, Russell and Wise counties. The petitioner requested authority to operate its train going in one direction on Tuesdays, Thursdays and Saturdays, and going in the other on Mondays, Wednesdays and Fridays, with no service on Sundays. This was to be in lieu of the present service of one passenger train in each direction daily.

The evidence shows, without contradiction, that since 1926 the railroad has operated its passenger service at a loss. Not only has there been a very substantial decline in the passenger business, but also a substantial decline in the distance traveled by the passengers. For instance, in 1946 there were 161,664 passengers, while in 1948 this number had been reduced to 109,009. In 1946 the passengers traveled an average distance of 30.39 miles, while in 1948 they traveled 26.82 miles.

There has been a substantial decline in the revenue produced by the passenger business. In the year 1946 this amounted to $150,515, but in 1948 it had decreased to $132,219 on the entire line. This included passengers, mail, express and freight.

The revenues in Virginia alone amounted to $44,142 for the year 1948, while the expenses of operation amounted to $98,773, which resulted in a loss of $54,631. The loss for the entire line amounted to $206,344.

In addition to the substantial decrease in the number of passengers hauled there has been an increase in the operating expenses for the passenger trains. On 1946 the total ex-

pense of operation was $276,145, while in 1948 it had increased to $338,563.

In considering these facts the State Corporation Commission granted the relief sought. It held that from a study of the figures on the passenger business it is shown that the passenger travel and revenues are steadily decreasing while the cost of operation is steadily increasing, and that there is not seen any probability of improvement in this condition.

The commission also found that while there was some testimony that inconvenience will result to the communities along the line by the removal of these trains and that there may be some disruption of the mail and express service, the evidence as a whole shows that there is a very small amount of express business carried on the trains. In conclusion the commission held that "While it must be accepted that to curtail passenger service will cause some inconvenience to the communities along the line of the railroad, nevertheless, conditions, circumstances and modes of travel have vastly changed during the period of this operation, and the railroad company should not be required to continue such service at the continual and increasing loss as here shown. Even the curtailed service as prayed for in the petition and permitted in the order appealed from will no doubt be operated at a considerable loss to the railroad. However, it is hoped that persons along the line will avail themselves of the present service to an extent that will justify this operation by the Clinchfield Railroad Company.

"It does not appear from the record that there is sufficient available passenger traffic, or the possibility of such traffic, to justify the continuance of daily and Sunday passenger service on the line of this railroad in Virginia."

In our opinion the finding of the commission is amply supported by uncontradicted evidence.

One of the objections of the appellants is that the order of the commission was based upon evidence taken before

the commission rather than upon facts determined by the commission from its independent investigation of the physical condition of the railroad as to the manner in which it operates, the security and accommodation afforded by the trains and as to whether or not the decline in passenger travel was due to the indifferent service rendered and facilities provided.

The duty imposed upon the commission by section 156(b) of the Constitution is, "supervising, regulating and controlling all transportation and transmission companies doing business in this State in all matters relating to the performance of their public duties * * * and shall require them to establish and maintain all such public service facilities and convenience as may be reasonable and just. * * *" Any party may have an appeal as a matter of right from the decision of the commission, and upon an appeal to this court we are required to "consider and determine the reasonableness and justness of the action of the commission * * * provided, however, that the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct * * * ." (Sec. 156(f) Virginia Constitution.)

For a discussion of what may constitute such "facilities and conveniences as may be reasonable and just", see opinion of Mr. Chief Justice Hudgins in *Atlantic Coast Line R. Co.* v. *Commonwealth*, *ante*, p. 241, 61 S. E. (2d) 5, handed down at the September, 1950, session at Staunton.

In *Aetna Ins. Co.* v. *Commonwealth*, 160 Va. 698, at page 719, 169 S. E. 859, in reviewing an insurance rate case we defined our duties and said: "This court will not disturb the action of the commission unless it appears that the commission has exceeded its constitutional or statutory powers; or that its action has resulted from an unreasonable exercise of its authority; or that it is based upon a mistake of law; or is contrary to the evidence, or without evidence to support it * * * ."

Under section 56-128 of the Virginia Code of 1950 the

State Corporation Commission is directed to examine all the railroads and the works and equipment thereof, and the works and equipment of all other transportation companies, and keep itself informed as to their physical condition and the manner in which they are operated with reference to the security and accommodation to the public.

Under section 56-43 it is provided that upon the complaint or application, of the mayor or council, or of the board of supervisors in whose territory a part of any transportation is located, it shall be the duty of the State Corporation Commission to make an examination of the physical condition and operation thereof, after giving notice.

There is no evidence in the record which discloses that the commission failed to make an actual physical inspection and independent investigation of the railroad and its equipment, and there is no evidence which tends to show that the appellants or any of those enumerated in section 56-43 requested that such an inspection be made. It will be presumed, however, in the absence of any evidence to the contrary, that the commission performed its duties under the law—that is, that it supervised, regulated, and controlled this company in all matters relating to the performance of is public duty. *Jacob* v. *Commonwealth*, 148 Va. 236, 138 S. E. 574, and *Hagood* v. *Commonwealth*, 157 Va. 918, 162 S. E. 10, 601; 20 Am. Jur., Evidence, sec. 170.

It is contended that the mail service will be curtailed in the communities in the four Virginia counties. As pointed out in *Lynchburg Traffic Bureau* v. *Commonwealth*, 189 Va. 612, at page 618, 54 S. E. (2d) 66, the government does not require railroads to transport mail. U. S. Code, Ann., Title 39, sec. 505, expressly provides that wherever it is found that adequate railroad facilities are not available the Postmaster General is authorized to contract for carrying the mail or for providing the necessary equipment for the government to carry the mail itself. It is a matter of common knowedge that when the commission allowed the removal of certain passenger trains running between Roa-

noke and Winston-Salem, North Carolina, the Postmaster General established what is known as highway postoffice service between Roanoke and Greensboro, North Carolina, and all intermediate points. This service has taken care of the disruption in the mail service by the removal of those trains. The same facilities might, if deemed necessary, be supplied in the area of the four Virginia counties.

The railroad company is not a common carrier of the United States mail. This is an exclusive function of the United States, and in an application to consider the reduction of passenger train service such as that now before us any alleged inconvenience with respect to the collection, transportation or delivery of the United States mail is not persuasive. It will not be assumed that the Postmaster General of the United States will fail to perform his duty to furnish adequate mail service for the communities that may be affected, if needed.

It is also contended that the commission heard evidence pertaining to the operation of the trains of the Clinchfield Railroad Company over its entire line and through the States of Kentucky, North and South Carolina, Tennessee, and Virginia, when it should have confined its consideration to the operation of the line within the territorial limits of Virginia.

In Exhibit No. 2, filed by the Clinchfield Railroad Company, is an account showing the revenues, expenses and loss as applicable to each state, and the details of the loss in each State are itemized. As previously shown, the loss as applied to Virginia was $54,631 for the year 1948. This was sufficient to show the facts as they pertained to Virginia. In any event, there is authority for the action of the commission in considering the earnings and losses of the entire system. In *Gardner* v. *Commerce Comm.*, 400 Ill. 123, 79 N. E. (2d) 71, the court said: "We hardly see how it could be claimed from such holding that the commission would not have a right to take into consideration as a factor the financial condition of the entire system in

weighing the question of public necessity and convenience." Continuing, the court said: "We held in the *Illinois Central Case* [*Illinois Cent. R. Co.* v. *Illinois Commerce Comm.*], 397 Ill. 323, 74 N. E. (2d) 545, 548, referring to what was said in *People* v. *St. Louis, etc., R. Co.*, 176 Ill. 512, 52 N. E. 292, 35 L. R. A. 656, 'The financial condition of the entire system might well be taken into consideration as a factor to be considered in arriving at just where the balance lies in weighing the question of public convenience and necessity. Many other factors are also to be considered, namely, the volume of business done at the station, the number of people to be accommodated, the present facilities, proximity to other agency stations, and the cost of furnishing such services.' It was also said in that case, 'Assuming the financial structure of the entire system to be in a most favorable condition, this in itself would not justify the continuation of an economic waste occasioned by the retention of an agency station when not in the interest of public necessity and convenience.' "

See also *Chicago, B. & Q. R. Co.* v. *Municipalities of Holdrege*, 152 Neb. 352, 41 N. W. (2d) 157; *Chicago, B. & Q. R. Co.* v. *Nebraska State Ry. Comm.*, 152 Neb. 367, 41 N. W. (2d) 165; *Chicago, B. & Q. R. Co.* v. *Ill. Commerce Comm.*, 82 F. Supp. 368; *Texas & New Orleans R. Co.* v. *Railroad Comm.* (Tex. Civ. App.), 220 S. W. (2d) 273, and *Atlantic Coast Line R. Co.* v. *Public Service Comm.*, 77 F. Supp. 675.

■ The commission is granted extensive powers in connection with these matters, and in reaching its conclusion we do not think it should be confined to the passenger business done in Virginia. A consideration of the business of the entire sytsem was relevant but, of course, not conclusive.

■■ The appellants argue that the loss of passenger business in Virginia was due to the maintenance and operation of old worn-out equipment, but there is no substantial evidence to sustain that argument. The perfectly obvious

reason for the loss of the passenger business is the fact that adequate bus lines operate through this territory upon improved highways affording better and more convenient service than the railroad company could provide. Again, the use by the people in that territory of their own private automobiles is another obvious reason. The passenger trains are not frequently used by them. Few persons are longer dependent upon public conveyance, and if a railroad company were to provide new, modern and expensive cars and engines the evidence discloses that there would be no appreciable increase in its passenger business. It is a matter of common knowledge that a revolutionary change has taken place in the field of passenger transportation. Travel by air, water, buses, and by privately owned automobiles has largely brought about the change. The railroads no longer have a monopoly on transporting passengers. The local railroad passenger travel largely has been transferred from the railroads to the highways, and this competition has, to a great extent, caused the loss to local passenger business. Public service commissions and courts cannot shut their eyes to the changed conditions when considering public convenience and necessity and adequate public service facilities and conveniences that are reasonable and just.

This case is controlled by the principles applied in *Lynchburg Traffic Bureau* v. *Commonwealth, supra.* Substantially all that we said in that case (pages 618 to 623, inclusive) is strikingly applicable here.

For the reasons stated, the order of the State Corporation Commission is affirmed.

*Affirmed.*