**CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY,**
Respondent,

v.

**PUBLIC SERVICE COMMISSION** of State of North Dakota; Brotherhood of Locomotive Engineers, Brotherhood of Firemen, and Brotherhood of Railroad Trainmen, Appellants.

No. 7778.

Supreme Court of North Dakota.

Aug. 14, 1959.

Gerald G. Glaser, Commerce Counsel, Bismarck, for appellant Public Service Commission.

Gallagher & Paul, Mandan, for appellants Brotherhood of Locomotive Engineers, Brotherhood of Firemen and Brotherhood of Railroad Trainmen.

Kelsch, Scanlon & Kelsch, Mandan, and Dwight Campbell, Aberdeen, S. Dak., for respondent Chicago, M., St. P. and P. R. Co.

SATHRE, Chief Justice.

This is an appeal by the Public Service Commission of the State of North Dakota, the Brotherhood of Locomotive Engineers, the Brotherhood of Firemen, and the Brotherhood of Railroad Trainmen, appellants, from a judgment of the district court of Bowman County, North Dakota, in favor of the respondent Chicago, Milwaukee, St. Paul and Pacific Railroad Company, a corporation. The respondent railroad company, which will be referred to hereinafter as the Milwaukee, owns and operates an interstate railway system between Chicago, Illinois, and Seattle-Tacoma, Washington. The main line of the Milwaukee traverses a part of North Dakota, entering the south line of the state at a point near Haynes and running in a northwesterly direction to Marmarth, North Dakota, near the North Dakota-Montana line, a distance of approximately 76 railroad miles.

At the time these proceedings were started the Milwaukee had in operation over its main line in North Dakota, and still has trains numbered 15 Westbound and 16 Eastbound, known as the Olympian Hiawathas, running between Chicago, Illinois, and Seattle-Tacoma, Washington. These are high-speed transcontinental trains making few local stops. These trains, however, do make regularly scheduled stops in each direction on the North Dakota portion of the main line, at Marmarth, Bowman, and Hettinger, furnishing interstate transportation to and from these points and intrastate transportation between them. Prior to these proceedings two other transcontinental passenger trains, numbered 17 and 18, operated between Chicago and Seattle-Tacoma. However, they were known as local trains and made local stops at practically all stations along the main line. The operation of these trains proved to be unprofitable and from time to time they were discontinued between designated points on the main line, and at the time of the commencement of these proceedings they were operating only between Marmarth, North Dakota, and Aberdeen, South Dakota.

On May 10, 1955, the Milwaukee posted public notice that trains Nos. 17 and 18 would be discontinued on May 21, 1955.

On May 16, 1955, the Public Service Commission, on its own motion, ordered a public hearing to be held on June 28,

1955, at Bowman, North Dakota, for the purpose of investigating the matter of public convenience and necessity of passenger train service on the main line of the Milwaukee between Lemmon, South Dakota, and Marmarth, North Dakota, and the Commission also ordered the Milwaukee to maintain operations of trains Nos. 17 and 18 until further order of the Commission.

Thereafter, upon application by the Milwaukee, the district court of Burleigh County issued an order restraining the Commission from enforcing that portion of its order requiring the Milwaukee to maintain operation of trains Nos. 17 and 18 pending hearing and final determination of the case.

After the hearing on June 28, 1955, the Public Service Commission on the 9th day of May, 1956, issued an order requiring the Milwaukee to restore daily-except-Sunday local main line service for passengers from Marmarth, North Dakota, to the North Dakota border point of entry of said main line each way, from and after the 9th day of June, 1956, such daily service to include baggage, express, and milk and cream between said points.

The Milwaukee appealed to the district court of Bowman County from the order and thereafter, on the 18th day of December, 1956, the Milwaukee applied to the district court for an order remanding the proceedings to the Commission for the purpose of taking additional evidence, which application was granted by order of the district court dated January 22, 1957.

A second hearing was held at Bowman, North Dakota, on March 28, 1957, at which time additional evidence was presented to the Commission by the Milwaukee. After a regular meeting held on June 14, 1957, and on July 18, 1957, the Commission issued its order denying the application of the Milwaukee for further consideration, affirming its original decision, and certified the entire record to the clerk of the district court of Bowman County.

The appeal to the district court was heard at Bowman, North Dakota, on November 9, 1957.

The district court reversed the order of the Public Service Commission, made findings of fact and conclusions of law, and ordered judgment in favor of the appellant Milwaukee, authorizing discontinuance of operation of trains Nos. 17 and 18.

Judgment was entered accordingly. The Commission and the three brotherhoods appealed to this court and have demanded a trial de novo.

It is the contention of the appellants that, under Section 49–1402 of the North Dakota Revised Code of 1943, the Milwaukee is required to maintain in operation on its railroad in North Dakota, each way on every business day, at least one local passenger train to consist of not less than one engine and tender and combination mail, express, and baggage car and two passenger coaches, and at least one freight train. Said section reads as follows:

"Every railroad corporation operating a line of railroad within this state, except a branch line, whether such line is wholly within this state or partly within this state and partly within another state or foreign country, shall move over its line of road within this state, each way on every business day of the year, at least one local passenger train to consist of not less than one engine and tender and combination mail, express and baggage car, and two passenger coaches, and at least one freight train. If any railroad corporation shall make it appear to the commission that the business on any line of its road will not justify its operating both the passenger and freight trains herein provided for and said commission shall so order, such company may operate one mixed train on such line each way on every business day in the year, for such time as said commission may direct. Such mixed train shall be sup-

plied with not less than one passenger coach and one combination baggage and passenger coach for the accommodation of passengers. For each violation of the provisions of this section the railroad company shall be subject to a fine of five hundred dollars."

Appellants further contend that the only change of service permitted from daily local passenger service under said statute, on proper showing, is maintenance and operation of one mixed train on the main line each way on every business day of the year, for such time as the Commission may direct, and that such mixed train shall be supplied with not less than one passenger coach and one combination baggage and passenger coach for the accommodation of passengers.

The respondent Milwaukee, however, argues that the only question for consideration under the order of the Commission of May 9, 1956, was whether local passenger train service furnished by the Milwaukee was adequate for the requirements of public convenience and necessity on the main line of the Milwaukee between Haynes and Marmarth, North Dakota.

The order issued by the Commission on May 9, 1956, is as follows:

"It is ordered that the Chicago, Milwaukee, St. Paul and Pacific Railroad be and it is hereby directed to restore daily except Sunday local main line service for passengers and L. C. L., baggage, express, milk and cream from Marmarth, North Dakota, to the North Dakota border point of entry of said main line each way from and after the 9th day of June 1956."

The questions thus presented upon the record before us are substantially as follows:

■ Does public convenience and necessity require the continued operation of trains Nos. 17 and 18 for daily local pas-

senger train service on the Milwaukee line within the State of North Dakota?

If it appears from the evidence and record that daily local passenger service is not necessary to satisfy the requirements of public convenience and necessity, must the Milwaukee nevertheless furnish such daily passenger service, under Section 49–1402 of the North Dakota Revised Code of 1943, even though such service can be provided only at a substantial loss to the Milwaukee?

The record in these proceedings establishes the following undisputed facts:

At the time of the discontinuance of local passenger trains Nos. 17 and 18, they were operating in interstate transportation of passengers, express, mail and milk and cream between Aberdeen, South Dakota, and Marmarth, North Dakota. It was stipulated, however, by all of the parties that the Commission had no jurisdiction over the operation of the trains in interstate transportation and that these proceedings are concerned only with the operation of those trains in North Dakota, that is, between Marmarth, near the west line of North Dakota, and Haynes, near the point of entry of the Milwaukee into the State. The Milwaukee introduced evidence and exhibits showing the number of passengers intrastate using train No. 17 Westbound for the calendar year 1954, its last full year of operation, by months, showing the points at which passengers boarded the trains and the number of passengers, the revenue therefrom, and the points at which they detrained. The total number of intrastate passengers using train No. 17 for the year was 188, an average of 15.7 passengers a month or 0.5 of a passenger per trip. The total revenue derived from those passengers for the year was $137.13, averaging $11.43 per month or $0.37 per trip.

The record shows that 39 of those passengers during the year boarded the train at Hettinger and went to Bowman, paying a total revenue of $36. For those passen-

gers, transportation was and still is available on train No. 15 for the same journey. During the year 13 passengers boarded the train at Hettinger and went to Marmarth, paying a total of $22.10. These passengers also could have used train No. 15 for the same journey. Twenty-eight of the 188 passengers, paying a total of $20.16, boarded the train at Bowman and went to Marmarth. They could have made the same trip on train No. 15, and still can.

Exhibit 10 furnishes the same information as to the intrastate use of train No. 18 Eastbound during its last full year of operation. It shows that a total of 300 passengers used the train eastbound, for a total revenue of $161.20. This amounts to an average of 25 passengers per month, for an average monthly revenue of $13.43. This is an average of 0.8 of a passenger per trip, for an average revenue per trip of $0.44.

The record further shows that 106 of these passengers who paid a total of $82.29 could have traveled and still can travel between the same points on train No. 16. This embraces 27 passengers during the year who got on at Marmarth and went to Bowman, paying a total of $19.44; five who got on at Marmarth and went to Hettinger, paying a total of $8.35; and 70 who got on at Bowman and went to Hettinger, paying a total of $54.50.

Exhibit 12 shows the intrastate use in North Dakota of train No. 17 Westbound and of train No. 18 Eastbound for the month of April, 1955, the last full month of operation. As to train No. 17 Westbound, a total of 15 intrastate passengers used the train in North Dakota, paying a total of $12.03. Eleven of those passengers boarded the train at Hettinger and went to Bowman, paying a total of $9. They could have made and still can make the same trip on train No. 15. One passenger entrained at Bowman and went to Marmarth, paying $0.72 for the trip. He could have made the same trip, and still can, on train No. 15. As for train No. 18 Eastbound for the

month of April, 1955, a total of 30 intrastate passengers used the train in North Dakota, paying a total of $13.11. One of these passengers boarded the train at Marmarth and went to Bowman, paying $0.72 therefor, and could have made and still can make the same trip on train No. 16. Five of the same passengers boarded the train at Bowman and went to Hettinger, paying a total of $5. They could have made and still can make the same trip on train No. 16.

Exhibit 3 shows that the total revenue of trains Nos. 17 and 18 for the year 1954, including express, milk and cream, and mail, properly allocable to the segment of line between Lemmon and Marmarth was $131,328. The total operating expense allocable to the segment was $209,515, making a total net loss of $78,187. This was an average net loss of $107.11 for each one-way trip, of which there were 730. The total passenger revenue per train per mile, both intrastate and interstate, was $0.45, and wages per train mile amounted to $0.76.

Exhibit 7 shows the revenue and expense allocable to the Lemmon-Marmarth segment covering both trains for the month of April, 1955, the last full month of operation. The total revenue was $5,205 and the total expense was $8,756, making a net loss for the 30-day period of $3,551 and a loss of $59.19 per one-way trip, of which there were 30. The total passenger revenue for interstate and intrastate travel per train mile for the month was $0.02, and the crew wages per train mile for the month amounted to $0.78.

With reference to Exhibit 3, it should be noted that income is shown not only for passenger transportation but also for mail, express, dining car and buffet, sleeping car, and milk and cream between Aberdeen, South Dakota, and Marmarth, North Dakota.

When trains Nos. 17 and 18 were discontinued, the United States Postal Department took over the mail service and the Milwaukee provided daily truck service for

milk and cream and express for the stations on the main line in North Dakota.

Exhibit 30 shows the total intrastate passenger revenue from 1921 to 1954, both inclusive, and for all intervening years. The total passenger revenue for the year 1921 was $65,931.19; for 1931 it was $7,476.97; for 1941 it was $2,222; and in 1954 the total passenger revenue was $403.

Exhibit 20 is a highway map showing that U. S. Highway No. 12, a good, surfaced all-weather highway, parallels the Milwaukee through all stations in North Dakota except Haynes, which is approximately one mile off Highway No. 12 but connected with it by a good gravel road. As pointed out herein, at the time of the discontinuance of trains Nos. 17 and 18, the Milwaukee furnished transportation of milk and cream and express, formerly carried on those trains between Aberdeen and Marmarth, by an over-the-highway truck service making daily round trips as shown by Exhibit 8.

It was stipulated by the parties that the Milwaukee main line in North Dakota traverses parts of the counties of Adams, Bowman, and Slope and that, according to the last Federal census, the population of Adams County was 4,910, of Bowman County it was 4,001, and of Slope County it was 2,315, making a total of 11,226 for the three counties. It was further stipulated that the records of the Motor Vehicle Registrar show that the total passenger automobile registration for these three counties was as follows: Adams County 1,584, Bowman County 1,491, and Slope County 670. This made a total passenger automobile registration for the three counties of 3,745, which would be almost precisely one passenger automobile for every three persons in the three counties.

■ The Public Service Commission is empowered by Section 49–0204 NDRC 1943 to:

"determine the just, reasonable, safe, proper, adequate, or sufficient rules, regulations, practices, equipment, appliances, facilities, service, or method to be observed, furnished, constructed, enforced, or employed,"

by the public utilities under its jurisdiction. However under such rules and regulations, the Commission may not under the guise of regulation take the property of a carrier by compelling it to provide services or facilities no longer necessary to public convenience and necessity. In the case of Atlantic Coast Line R. Co. v. Public Service Commission of South Carolina, 77 F. Supp. 675–676, 684, the District Court, E. D. South Carolina, Columbia Division, a 3-judge tribunal held that:

"The Public Service Commission of South Carolina, under the statutes of the State, has the power to regulate the services and facilities of common carriers with reference to the security and accommodation of the public, but that power is not unlimited and is circumscribed by the provisions of the United States Constitution. Under the guise of such regulation the property of a carrier may not be taken by requiring it to furnish services or facilities no longer reasonably necessary to serve the public."

■ Section 49–1402 NDRC 1943, must be construed in light of and together with Section 49–0204 NDRC 1943, supra, and other statutes relating to public utilities. The rule is well settled that where the language of a statute is of doubtful meaning, or where adherence to strict letter thereof will lead to injustice, to absurdity, or to contradictory provisions, duty devolves on the courts to ascertain the meaning. Rybnicek v. City of Mandan, N.D., 93 N.W.2d 650; Hoellinger v. Holzhon, 77 N.D. 108, 41 N.W.2d 217, 19 A.L.R.2d 1147; Ulrich v. Amerada Petroleum Corp., N.D., 66 N.W.2d 397.

In 82 C.J.S. Statutes § 322, pages 588, 589, 590 it is stated:

"The duty devolves on the court to ascertain the true meaning where the

language of a statute is of doubtful meaning, or where an adherence to the strict letter would lead to injustice, to absurdity, or to contradictory provisions, since an ambiguity calling for construction may arise when the consequence of a literal interpretation of the language is an unjust, absurd, unreasonable, or mischievous result, or one at variance with the policy of the legislation as a whole; and the real meaning of the statute is to be ascertained and declared, even though it seems to conflict with the words of the statute. It is only when the terms of a statute, which do not accord with the general intent are plainly expressed that they will prevail.

"If the intention of the legislature cannot be discovered it is the duty of the court to give the statute a reasonable construction, consistent with the general principles of law. Only where a statute is so vague that it is impossible to resolve the doubts therein will the courts refuse to enforce it."

To the same effect is the following statement from 50 Am.Jur., Statutes, Section 229, page 216:

"Notwithstanding the general rule against the enlargement or extension of a statute by construction, the meaning of a statute may be extended beyond the precise words used in the law, the words or phrases may be enlarged, where that is necessary to obviate repugnancy and inconsistency, and give effect to the manifest intention of the legislature, as discovered by the application of sound principles of interpretation, and to carry out the general scope and purpose of the act."

In the instant case the evidence clearly shows that the demand for local passenger service on the Milwaukee line in this state is so slight as practically to be nil. The record shows that the average intrastate passenger per month for 1954 on westbound train No. 17 was 0.5 of a passenger per daily trip, and for east bound train No. 18 the average passenger rate per daily trip was 0.8 of a passenger. It also appears that many of the passengers who traveled locally on trains 17 and 18 could have made the same trip on trains numbered 15 and 16. The record further shows that the expense of the Milwaukee in maintaining the operation of trains 17 and 18 greatly exceeds the revenue derived from their operation.

In the case of Fleming v. Commonwealth ex rel. Clinchfield R. Co., 191 Va. 288, 61 S.E.2d 1, 4, the Supreme Court of Appeals of Virginia said:

"It is a matter of common knowledge that a revolutionary change has taken place in the field of passenger transportation. Travel by air, water, buses, and by privately owned automobiles has largely brought about the change. The railroads no longer have a monopoly on transporting passengers. * * * Public service commissioners and courts cannot shut their eyes to the changed conditions when considering public convenience and necessity and adequate public service facilities and conveniences that are reasonable and just."

In Atlantic Coast Line R. Co. v. Public Service Commission of South Carolina, 77 F.Supp. 675–676, supra, it was held that:

"An order of the South Carolina Public Service Commission requiring the continued operation of two intrastate passenger trains at a substantial loss could not be sustained even if the railroad system as a whole was run at a profit.

*      *      *      *      *      *

"Whether a carrier may discontinue the operation of two intrastate passenger trains must be determined in light of the character and population of the territory served, the public patronage or lack of it, the facilities remaining, the expenses of operation as compared

with revenue from such trains and the operations of the carrier as a whole."

In Re Application of Chicago, B. & Q. R. Co., 152 Neb. 367, 41 N.W.2d 165, 167, the Supreme Court of Nebraska said:

"The record shows as we have herein cited that the public makes little use of the passenger service afforded. The discontinuance of the two trains in question will cause inconvenience to a few persons and businesses. This is not a criterion to be considered, however, when other forms of transportation are available and preferred."

And in In re Application of Chicago, B. & Q. R. Co., 152 Neb. 352, 41 N.W.2d 157–159, the Supreme Court of Nebraska said:

"Where some inconvenience would result to a small number of the public by discontinuance of the service of branch line of a railroad, but other services existent and prospective could handle all the business handled by the railroad with comparatively little extra trouble and additional expense to the public, and the evidence shows that loss in revenue by continuance of the service of passenger trains on a branch line overbalanced inconvenience to public from discontinuance thereof, it is unreasonable and arbitrary for the Nebraska State Railway Commission to deny application for the railroad to discontinue such branch line service."

"The power of the state to control and regulate train service must be exercised within constitutional limitations. In the exercise of its power to regulate train service, the state cannot add provisions to contracts between railroads. Statutes passed in the exercise of the state's power to regulate train service must be reasonable and not arbitrary and cannot compel service involving a loss on the whole road." 74 C.J.S. Railroads § 417, p. 982.

In the same Volume, § 418, page 983, it is stated:

"A statute empowering the commission to require railroads to run at least one unmixed daily passenger train each way over their lines vests discretion in the commission with respect to prescribing what service shall be a sufficient discharge of a railroad's statutory duty to furnish passenger service."

■ It is clearly established by the record in the instant case that public convenience and necessity do not require operation of local trains 17 and 18, and that the expense to the Milwaukee in maintaining operation of trains 17 and 18 greatly exceeds the revenue derived therefrom, and that it would be unreasonable and unjust to require the Milwaukee to continue operation of these two trains.

■ While the language of Section 49–1402 NDRC 1943 is mandatory in form in that it requires that every railroad within the state "shall move over its line of road within this state, each way on every business day of the year, at least one local passenger train to consist of not less than one engine and tender and combination mail, express and baggage car, and two passenger coaches", * * * it certainly could not have been the intention of the Legislature in enacting the statute to require railroads to maintain operation of local passenger trains where, as in the instant case, passenger travel by rail had practically been abandoned. If the statute were to be construed so as to require a railroad to provide daily local passenger service even though no need existed therefor, and notwithstanding great financial loss to the railroad such construction would render the statute violative of the constitutional provision that "no person shall be deprived of property without due process of law." Const. § 13. We hold that such is not the intent of said statute. We conclude that under said statute a railroad is required to maintain daily local passenger service only where need exists therefor, that is when required to satisfy public convenience and necessity.

The order of the district court and the judgment entered thereon are affirmed.

BURKE, J., concurs.

MORRIS, Judge.

I concur in the result of this opinion upon the ground that under this record the refusal of the Public Service Commission to grant the respondent's application to discontinue operation of trains numbers 17 and 18 results in an unconstitutional application of Section 49–1402 NDRC 1943 that is confiscatory and violative of the due process clauses of the federal and state constitutions.